IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,007

In the Matter of SHAWN E. STEWART,
*Respondent.*

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held January 30, 2025. Opinion filed February 27, 2026. Published censure.

*Kate Duncan Butler,* Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was with her on the formal complaint and brief for the petitioner.

*John J. Ambrosio,* of Morris, Laing Law Firm, of Topeka, argued the cause and was on the brief for respondent, and *Shawn E. Stewart,* respondent, argued the cause pro se.

PER CURIAM:  This is an original proceeding in discipline filed by the Office of the Disciplinary Administrator (ODA) against the respondent, Shawn E. Stewart, of Allen, an attorney admitted to practice law in Kansas in September 2002.

In February 2024, the ODA filed a formal complaint against Stewart alleging violations of the Kansas Rules of Professional Conduct (KRPC). Stewart, through counsel, filed an answer, and before the hearing the parties filed a joint stipulation. The parties filed an additional joint stipulation the day of the hearing. Through these filings, Stewart stipulated to facts and agreed his conduct violated KRPC 8.4(c) (2025 Kan. S. Ct. R. at 426) (engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Those stipulations, other evidence, and arguments were presented to a hearing panel. The panel then made findings of fact and conclusions of law, concluding that

1

Stewart had made a misrepresentation, violated KRPC 8.4(c), and should be disciplined by published censure. The ODA filed exceptions to numerous findings of fact and conclusions of law and continues to recommend to us that Stewart be disciplined by indefinite suspension. Stewart filed no exceptions and asks us to impose published censure for his stipulated violation. There are three distinct majorities in this case which, taken together, are determinative of the outcome and legal holding expressed in this per curiam opinion. Given the uniqueness of this fact, we take a moment to expressly and precisely explain how we got here, and set out a road map of the separate opinions that follow.

The first majority—consisting of Chief Justice Rosen and Justices Luckert, Biles, and Standridge—find clear and convincing evidence supports the panel's determination that Stewart misrepresented his income from the practice of law when making a report to the Kansas Department of Revenue. That majority also finds that Stewart's misrepresentation violated KRPC 8.4(c), albeit under differing rationales. That majority agrees with the panel's recommendation of published censure, noting that the American Bar Association Standards for Imposing Lawyer Sanctions, Standard 5.13 allows for published censure when a lawyer makes a misrepresentation "that adversely reflects on the lawyer's fitness to practice law." Justices Stegall and Wall dissent from this majority's holding.

A second majority of the court—consisting of Chief Justice Rosen and Justices Luckert, Stegall, and Wall—holds that when the ODA asserts a violation of KRPC 8.4 on the basis of an alleged misrepresentation, the ODA must prove by clear and convincing evidence both that the alleged misrepresentation was made and that the misrepresentation adversely reflects on the lawyer's fitness to practice law. Under this holding, both prongs must be met before a rule violation may be found. Justices Biles and Standridge dissent from this majority's holding.

2

A third and final majority of the court—consisting of Justices Luckert, Stegall, Wall, and Standridge—affirms the panel's determination that Stewart did not make any other misrepresentations as alleged by the ODA. Chief Justice Rosen and Justice Biles dissent from this majority's holding.

Multiple separate opinions are filed with this per curiam opinion to explain the differing rationales.

First, Chief Justice Rosen writes separately to join the first and second majorities outlined above. But Chief Justice Rosen dissents from the third majority's conclusion to affirm the panel's finding that Stewart did not make other misrepresentations. Chief Justice Rosen would find additional violations of KRPC 8.4.

Justice Luckert writes separately to join the first, second, and third majorities outlined above.

Justice Biles writes separately to join the first majority outlined above. But he, joined by Justice Standridge, dissents from the second majority's conclusion that KRPC 8.4(c) requires an additional showing that a misrepresentation adversely reflects on the attorney's fitness. Justice Biles also dissents, joined by Chief Justice Rosen, from the third majority's conclusion that Stewart did not make other misrepresentations.

Justice Stegall, joined by Justice Wall, writes separately to join the second and third majority's holdings. But, Justice Stegall dissents from the first majority's holdings and concludes that Stewart made no misrepresentation adversely reflecting on his ability to practice law. As such, Justice Stegall finds that Stewart did not violate KRPC 8.4.

Ultimately, the shifting majorities of the court find as follows: (1) An attorney misrepresentation violates KRPC 8.4(c) only when there is an additional showing that

3

misrepresentation adversely reflects on the attorney's fitness to practice law; (2) the panel's conclusions that Stewart made one and only one misrepresentation that adversely reflected on his fitness to practice law were supported by clear and convincing evidence; and (3) Stewart is disciplined by an order of published censure.

FACTUAL AND PROCEDURAL BACKGROUND

The relevant portions of the final hearing report are set forth below.

"*Findings of Fact*

"14.    The hearing panel finds the following facts, by clear and convincing evidence:

"15.    Many of the hearing panel's findings of fact come from the parties' joint stipulation, filed March 27, 2024, and additional joint stipulation, filed May 1, 2024. Other findings of fact are based on the evidence and testimony received by the hearing panel. Findings made based on a stipulation will include citation to that stipulation.

"16.    When the respondent graduated from law school, he worked for the law firm of King Hershey until 2002 and then he opened a private-practice law firm in Kansas City, Missouri. Most of his work came from real estate developers in and around Kansas City.

"17.    Through the respondent's testimony, the hearing panel learned that the respondent's law firm was registered as a Limited Liability Company and the respondent was a solo practitioner. Exhibit 8, the respondent's 2019 tax return, also indicates that his law practice operates as an LLC called 'Stewart Law Firm, L.C.' For the remainder of this report, the panel will refer to 'Stewart Law Firm, L.C.' as 'the Law Firm.'

4

"18.     In 2006, the respondent assisted a client with a land development deal that included establishing a business on the property at issue. The business succeeded, and over time, it became the respondent's primary client.

"19.     The respondent filed federal litigation on behalf of the business in 2017. In 2019, and before litigation ended, the client sold the business.

"20.     By the end of 2019, the client became concerned that he could not continue to pay the costs of litigation. Because the respondent had already completed a significant amount of work for the case, they jointly converted the representation to a contingency-fee matter.

"21.     The respondent was successful in obtaining a judgment on behalf of his client in the litigation, however, the respondent thought there was a slim chance of being able to collect the judgment from the opposing party.

"22.     In March 2020, the litigation was transferred to the United States District Court for the District of Kansas for collection of the judgment. [The Joint Stipulation references March 2019, however, the hearing panel believes this is a typographical error].

"23.     That same month, national and state officials declared COVID-19 health emergencies that shut down many businesses and government agencies.

"24.     In light of these emergencies, the respondent applied for unemployment benefits with the Kansas Department of Labor (KDOL). The respondent and his client had converted his representation to a contingency-fee matter months before. The respondent indicated on his application that the pandemic 'shut [his] only client down.'

"25.     The joint stipulation states that in 2019, 'the client sold the business,' but also later states that the respondent continued to represent the client in the federal litigation. It is unclear whether the respondent continued to represent the business, the individual who previously owned the business, or both, after 2019.

5

"26.     When asked by the hearing panel about this, the respondent testified that he had a letter indicating that his client's main operations had closed.

"27.     Because he did not report any wages, KDOL found that he did not qualify for unemployment and denied his claim. At that time, the CARES Act, referenced below, had not yet been enacted.

"28.     The United States Congress passed the CARES Act on March 27, 2020. The act provided a mechanism for self-employed people to receive a particular kind of unemployment benefit called Pandemic Unemployment Assistance (PUA).

"29.     On May 12, 2020, KDOL sent an email to the respondent notifying him of the PUA and inviting him to apply, stating:

'On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) into law. Section 2102 created a new federal program called Pandemic Unemployment Assistance (PUA) that provides benefits to those traditionally ineligible for unemployment, including those who are self-employed or independent contractors, church or religious organization employees, and non-covered farm workers. It also covers those who do not have enough wages to support a regular state unemployment claim or who have been disqualified for state unemployment benefits.

'Our records indicate you may be eligible for PUA benefits.'

"30.     The respondent promptly applied for PUA, indicating that he had become unemployed by COVID-19 on February 29, 2020.

"31.     The PUA Questions form consisted of two pages of questions and appears to have been completed and submitted online, based on symbols and words at the bottom of the second page. The copy of the PUA Questions form in exhibit 7 is unclear regarding what boxes are checked and not checked.

6

"32.     In some boxes on exhibit 7, there appears to be some marking, however, the hearing panel is unable to conclusively distinguish whether certain boxes are checked. For example, the first and third questions on the form appear to have some marking next to both the 'Yes' and 'No' answers.

"33.     The PUA application also required that the respondent provide information on his income for each quarter of 2019.

"34.     The entire PUA application is contained in exhibits 7 and 31. The PUA application uses the terms 'wages,' 'income,' 'gross income,' and 'net income,' but does not define them. For example, the first paragraph in exhibit 31 states:

'Enter your 2019 income by quarter in the spaces below. If no wages were earned in a quarter, enter 0. If you do not know your income by quarter, you may take your annual amount and divide it by the number of quarters you worked in 2019.'

The fourth paragraph in exhibit 31 states:  'If you are reporting self-employment wages use your net income.'

"35.     The complainant in this case, an appeals referee for KDOL, stated that the distinction between gross income and net income was 'a common point of misunderstanding for a lot of PUA applicants.'

"36.     For purposes of this final hearing report, the hearing panel will use the term 'gross receipts of the Law Firm' to refer to payments received by the Law Firm, such as the amount referenced on Line 1 of Schedule C of the respondent's 2019 income tax return. The panel will refer to the 'net income of the Law Firm' to refer to payments received by the Law Firm minus the Law Firm's expenses, such as the amount referenced on Line 31 of Schedule C of the respondent's 2019 income tax return. When referring to the income the respondent personally received from the Law Firm, the hearing panel will use the term 'personal income.' Based on the evidence, the respondent took draws from the LLC as opposed to paying himself wages, so the term 'wages' does not apply to his situation.

7

"37.     The respondent reported $30,000 in personal income for each quarter, or a total of $120,000 of earnings in 2019. He self-certified the accuracy of his personal income on the online form.

"38.     KDOL sent the respondent notice of the PUA benefit amount the respondent was eligible for based on his application. The document, which showed the respondent had reported $120,000 in annual personal income, reflected it was mailed to the respondent on May 29, 2020.

"39.     The respondent's 2019 tax return was not filed with the IRS until October 2020. Therefore, the respondent did not have a filed tax return for 2019 to reference for purposes of completing the PUA application in May 2020.

"40.     The respondent's self-report of earning $120,000 in personal income for 2019 did not match the personal income ultimately shown on his 2019 tax return. Although the Law Firm took in gross receipts of roughly $145,000 in 2019, the respondent's personal income was only $36,722.

"41.     KDOL also required that PUA applicants provide documents evidencing their eligibility. Rather than provide his 2019 tax returns, the respondent uploaded bank statements. He also uploaded client invoices to show the legal work he had completed.

"42.     As noted above, the respondent's 2019 tax return was not available yet when he applied for PUA assistance in May 2020, as it was not completed and filed until October 2020.

"43.     At the time, KDOL's policy was to trust applicant self-certification. The respondent soon began receiving benefits backdated to March 7, 2020.

"44.     To maintain PUA benefits, KDOL required applicants to file weekly claims indicating that they did not work during the week in question. Each week from March 7, 2020, until September 4, 2021, the respondent filed for benefits.

8

"45.    Except for the week of May 2, 2020, the respondent indicated on each application that he had neither worked nor received compensation for the week in question. He also certified each week that either his workplace had closed because of COVID-19 or the pandemic had caused a serious reduction in his self-employed services.

"46.    The term 'work' was not defined in the weekly claim applications, nor was there any instruction about how a self-employed professional should determine what type of work needed to be reported. For example, there was no indication whether an attorney should report time the attorney spends on non-billable work, or whether the attorney should just report billable hours worked.

"47.    When asked by the hearing panel about checking the box indicating his place of employment had closed on some of the weekly claim questions, as he did on exhibit 11, BS0025, the respondent testified he did not remember clicking that box. The respondent also testified that his place of employment could not have closed because he operated his office out of his house. Further, the respondent testified that his only client's main operations had closed.

"48.    The Weekly Claim Questions form appears to be an online form based on symbols and words at the bottom of the second page of each form. The option to select 'My place of employment is closed as a direct result of COVID-19' is located immediately above the option to select 'I am self-employed (including an independent contractor or gig worker) and experienced a significant reduction of services because of the COVID-19 public health emergency.'

"49.    The weekly form required the applicant to certify the truthfulness of the information under penalty of perjury. It also warned of the penalties for deliberately providing false information to receive benefits.

"50.    For almost every week from March 7, 2020, to April 3, 2021, the respondent received PUA benefits. The week of May 2, 2020, the respondent did not receive benefits as he had reported that he received personal income that week. But the respondent stipulated that he did work during many of the weeks in which he received benefits.

9

"51.    As noted above, the KDOL weekly claim form did not specify what type of 'work' needed to be reported. The panel did not hear evidence regarding whether the work the respondent completed was hours for which the respondent could have received compensation.

"52.    The respondent represented in his applications that he did not receive any personal income during all but one of the weeks. The Law Firm had received eight separate payments of more than $120,000 in compensation from clients during this time period. The payments totaling $124,881.00 represent gross receipts of the Law Firm, not the respondent's personal income.

"53.    According to an email from his attorney to the disciplinary investigator, the Law Firm received these payments on the following dates:

| | |
|---|---|
| $1,778.75 | Week of February 16, 2020 |
| $72,496.25 | Week of October 11, 2020 |
| $6,418.75 | Week of February 28, 2021 |
| $7,937.50 | Week of April 11, 2021 |
| $19,581.00 | Week of April 18, 2021 |
| $375.00 | Week of May 9, 2021 |
| $3,318.75 | Week of May 30, 2021 |
| $9,912.50 | Week of November 14, 2021 |
| $3,062.50 | Week of November 21, 2021 |

"54.    Through the hearing panel's questioning of the respondent during the formal hearing, the respondent confirmed that receipt of payment from clients to the Law Firm totaling more than $120,000 did not equate to the amount of personal income he received. The respondent acknowledged that Law Firm's gross receipts is different from personal income and that Law Firm expenses and other circumstances factor into the amount finally received by him as personal income.

"55.    Further, the hearing panel notes that paragraph 19 of the joint stipulation does not precisely match with Disciplinary Administrator's exhibit 30, in which the respondent's attorney indicates the respondent reported gross receipts to the Law Firm of $74,275 for the entire 2020 year and $50,606 for the entire 2021 year, some of which occurred after April 2021. In exhibit 30, the respondent's attorney incorrectly refers to the

gross receipts of the Law Firm as the respondent's personal income. The evidence received during the formal hearing clarified that these amounts were gross receipts of the Law Firm in 2020 and 2021, not the respondent's personal income.

"56.     In December 2020, Congress extended PUA benefits. The extension required that self-employed individuals provide documentation substantiating their claimed personal income.

"57.     Notice was sent to the respondent that, as a claimant, this new law required him to submit all new documentation to verify his self-employment or a plan of self-employment. The notice stated that examples of documents that could be provided to establish self-employment or planned self-employment were:  state or federal employer identification numbers, business licenses, tax returns, business receipts, signed affidavits from persons verifying the individual's self-employment, written business plans, or a lease agreement.

"58.     The respondent filled out forms recertifying his eligibility for benefits in January 2021. In March 2021, KDOL emailed out a notice to applicants about the new documentation requirements. A few months later, in May 2021, the respondent uploaded his 2019 tax return and an office lease agreement for his home office to the PUA portal.

"59.     This office lease indicated that the Law Firm leased his home office space from Kansas Properties Management Services, LLC for $1,500 a month. The lease stated that the company owned the respondent's home.

"60.     Kansas Properties Management Services, LLC is a limited-liability company first formed on March 18, 2021. The articles of organization for the company filed with the Kansas Secretary of State listed the respondent's wife as the registered agent and organizer of the company, and the lease indicated that she also served as its president.

"61.     Despite Kansas Properties Management Services, LLC being incorporated in March 2021, the lease's effective date is January 1, 2020.

11

"62.    The company was forfeited in 2022 for failing to file an annual report.

"63.    The respondent admits to both creating Kansas Properties Management Services, LLC and the lease on March 18, 2021, and then uploading the backdated lease to the PUA portal. He states he cannot recall why he created the lease, asserting that it may have been for PUA purposes. He also asserts it was not for tax purposes.

"64.    In a supplemental statement the respondent provided on April 25, 2023, during the disciplinary investigation, the respondent stated that he had claimed a tax deduction for his home office space for many years prior but created a written lease for purposes of the PUA application requirements.

"65.    In April 2021, KDOL suspended the respondent's PUA benefits as it investigated his eligibility. Despite this suspension, the respondent continued to file weekly claims. He also sent numerous emails to KDOL asking for information about his account and missing payments.

"66.    The PUA program ended in September 2021.

"67.    That same month, a KDOL fraud investigator reached out to the respondent with questions concerning his initial application for PUA benefits and missing documentation. This email did not name the investigator or contain any information confirming its authenticity, leading the respondent to believe it was spam. The respondent did not respond.

"68.    When the respondent did not reply within a few weeks, the manager of the fraud unit sent a second email and asked that he reply. The respondent did not write back but called and left a message.

"69.    The initial investigator responded to this call by email on October 1, 2021, asking the respondent to respond to the questions in writing. The respondent did not respond.

"70.     On October 19, 2021, KDOL emailed the respondent a Notice of Determination explaining that he had been disqualified for PUA benefits because he 'knowingly made a false statement or allowed another to do so, or [he] failed to provide the required information, in order to obtain benefits to which [he] was not entitled.' The hearing panel notes that there was no affirmative determination by KDOL that the respondent knowingly provided false information, but rather KDOL made a default finding on one of these three alternative bases.

"71.     The respondent filed a notice of appeal of this decision on November 3, 2021.

"72.     That same day, he also discovered that he had received a monetary redetermination of his benefits. This redetermination adjusted his benefits down to be more consistent with his 2019 tax return information. The respondent also appealed this decision.

"73.     The respondent testified during the formal hearing that when he received this notification in November 2021, he had hired a lawyer who discussed the issue with legal counsel for KDOL. The respondent said he wanted to pay back any amount that he was not entitled to receive, but that legal counsel for KDOL told his lawyer that the KDOL did not have a procedure for accepting payments from the respondent. The respondent testified that his lawyer was told by KDOL the only thing he could do to pay the amount back was appeal the determination.

"74.     The KDOL Office of Appeals set a hearing on the respondent's appeals on November 15, 2022.

"75.     The respondent did not appear at the scheduled hearing. The Appeals Referee issued a default order upholding both the finding of fraud and the redetermination. Specifically, the order stated:  'Claimant is not eligible for PUA beginning February 23, 2020, because Claimant knowingly made a false statement or allowed another to do so, or failed to provide information, in order to obtain benefits to which Claimant was not entitled.' The referee also filed a complaint with the Office of the Disciplinary Administrator (ODA). Again, the hearing panel notes that there was no

13

affirmative determination by the Appeals Referee that the respondent knowingly provided false information, but rather made a default finding on one of these three alternative bases.

"76.    The respondent cooperated in the ODA's investigation. He acknowledged that he behaved dishonestly in applying for benefits while actively working. He initially worried that the Law Firm would not weather the pandemic; after it did, he continued to apply for PUA benefits to establish a 'financial safety net.'

"77.    According to Disciplinary Administrator's exhibit 30, which references the respondent's 2020 tax return, the Law Firm had a total of $74,275 in gross receipts for all of 2020, which was received as a $1,778.75 payment the week of February 16, 2020, and a $72,496.25 payment received the week of October 11, 2020.

"78.    The respondent testified during the formal hearing that the $72,496.25 payment was received due to collection of the outstanding judgment in the contingency fee litigation that he had not expected to be able to collect.

"79.    Upon questioning by the hearing panel, the respondent acknowledged that the $74,275 in payments was gross receipts of the Law Firm, not personal income received by the respondent. There was no evidence presented regarding what the Law Firm's expenses were for 2020, or whether those expenses were more than or less than the Law Firm's gross receipts. The respondent's 2020 income tax return was not presented as evidence to the hearing panel, nor was any evidence of what amount of personal income the respondent received from the Law Firm.

"80.    During his testimony, when asked by members of the hearing panel what [was] incorrect or false about his applications to KDOL, the respondent was unable to identify what he told KDOL that was incorrect or false.

"81.    Since approximately October 2021, the respondent has attempted to find a way to pay back the money he received. On January 25, 2024, the respondent signed an Overpayment Account Repayment Plan with KDOL and agreed to voluntarily make

14

monthly payments in the amount of $1,000.00 per month to KDOL to repay the PUA overpayment. Additionally, findings of fraud in the initial application require repayment of all benefits received and an additional 25% penalty.

"82. In calculating the repayment amount, KDOL determined how many weeks the respondent had claimed benefits, the amount of lost income the respondent reported to KDOL, and the different available programs the respondent had drawn benefits from.

"83. The respondent agreed to repay KDOL $45,645. This total amount represents $23,376 in Pandemic Unemployment Assistance (PUA), $12,900 in Federal Pandemic Unemployment Compensation, $1,800 in Lost Wages Assistance, and a PUA penalty of $8,569.

"84. Based upon the above-stipulated facts, the respondent stipulates that his conduct violated KRPC 8.4(c) (misconduct).

"85. Through the respondent's testimony, the hearing panel learned that the respondent suffers from alcoholism. Alcoholism runs in his family and the respondent recognized in hindsight that he began to struggle with alcoholism at a young age. The respondent did not fully realize the impact that it had on his life until late 2021.

"86. While the respondent had experienced prior years of sobriety, in 2019 he began drinking excessively during the day. By March 2020, he was drinking more than 12 beers per day.

"87. During the pandemic, he was drinking hard liquor in the morning and ignoring his responsibilities.

"88. At the time the respondent filed the applications for unemployment assistance, PUA assistance, and the weekly claim questionnaires, he was generally drinking alcohol all day every day. This was also the circumstances under which the respondent communicated with the KDOL fraud investigation unit.

15

"89.     The respondent testified that this impacted his ability to function and his judgment. However, at no time did the respondent blame alcohol for his conduct. The respondent accepted full responsibility for his misconduct. He expressed remorse for his conduct and said that he was embarrassed, ashamed, and believed that his conduct at that time did not represent who he really is.

"90.     However, since late 2021, the respondent began to take action to achieve sobriety. He testified that as of the day of the formal hearing, he had not consumed alcohol for 522 days straight. The respondent has also engaged the help of KALAP, has a KALAP monitor who he speaks with at least every two weeks, and has regularly attended Alcoholics Anonymous meetings several times per week. The respondent also attributes rejoining his church as a support for him in his sobriety.

"*Conclusions of Law*

"91.     Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 8.4(c) (misconduct), as detailed below.

"KRPC 8.4(c)

"92.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c).

"93.     The respondent stipulated that he violated KRPC 8.4(c).

"*Misrepresented 2019 Income*

"94.     The respondent misrepresented the amount of his 2019 net income on the PUA Questionnaire. The respondent stated that his net income for 2019 was $30,000 per quarter for a total of $120,000 for the entire year.

"95.     The respondent's business income for 2019 as shown on Schedule 1, Line 3 of his 2019 tax return was $36,722. This was also the amount of personal income the respondent received from his Law Firm.

16

"96.     The amount reported by the respondent to KDOL misrepresented the facts, and the respondent was negligent in not doing a more thorough job of determining what his 2019 net income was.

"97.     The hearing panel specifically concludes there was no evidence the respondent's misconduct was intentional or that he engaged in conduct involving fraud, dishonesty, or deceit regarding his representation of his 'income' on the PUA application.

"98.     In reaching this conclusion, the hearing panel considers the following: 1. There was no evidence that KDOL provided a clear definition on the PUA application form for the terms 'income,' 'gross income,' or 'net income' or specif[ied] exactly how a self-employed individual's 'income,' 'gross income,' or 'net income' should be calculated for purposes of the application; and 2. the PUA application was filled out by the respondent in May 2020 and his 2019 income tax return was not filed until October 2020, meaning there was no evidence the respondent knew what his actual net loss or profit from the Law Firm was when he filled out the PUA application.

"*Only Client Shut Down Statement*

"99.     The disciplinary administrator's office asserts that the respondent's statement on his March 2020 application for unemployment benefits that '[t]he COVID-19 virus has shut my only client down' was dishonest because the respondent had transferred the fee agreement with that client regarding pending federal litigation to a contingent fee agreement.

"100.    The respondent confirmed during his testimony that he primarily represented only that sole client when the pandemic shut-downs began and that his client's business was closed for the foreseeable future. The hearing panel concludes there was not clear and convincing evidence presented that the client was not shut down by the COVID-19 virus.

"101.    Further, the hearing panel concludes that the conversion of the client's pending federal litigation representation to a contingent fee agreement does not make the

17

respondent's statement on exhibit 4 dishonest. The conversion of that case to a contingent fee agreement did not change the fact that the respondent's client was unlikely to bring any further work to the respondent's firm for the foreseeable future after it had shut down.

"102.    The hearing panel concludes that there is not clear and convincing evidence the respondent's statement that '[t]he COVID-19 virus has shut [his] only client down' was fraudulent, deceitful, dishonest, or a misrepresentation of the facts.

"*Weekly Claim Responses*

"103.    On Weekly Claim Questionnaires sent by KDOL, the respondent repeatedly marked 'No' in response to the question:  'Did you work in or receive any compensation for self-employment during the week being claimed?'

"104.    The disciplinary administrator's office asserts that this was dishonest because the respondent admitted there were times that he worked while marking on these weekly claims he had not worked, and the Law Firm received payments totaling $74,275 in 2020 that the respondent did not report as compensation received for self-employment.

"105.    The respondent stipulated that between March 7, 2020, and April 3, 2021, he received eight separate payments of more than $120,000 in compensation from clients. However, the hearing panel learned from exhibit 30 and the respondent's testimony that the $124,881.00 was not personal compensation to the respondent, but payments received by the Law Firm. Additionally, the full $124,881.00 was not received before April 3, 2021.

"106.    As noted above, the hearing panel asked the respondent about the $74,275 received by the Law Firm in 2020 and learned that this was not compensation received by the respondent, personally, but gross receipts of the Law Firm. There was no evidence regarding what the Law Firm's expenses were for 2020 or whether those expenses were more than or less than the Law Firm's gross receipts. The respondent's 2020 income tax return was not presented as evidence to the hearing panel. As a result, there was not clear and convincing evidence that the respondent received any personal income in 2020 that was not reported on the Weekly Claim Questionnaires.

18

"107.    There also was not clear and convincing evidence that the respondent received any personal income in 2021.

"108.    Because of this, the hearing panel concludes that there is not clear and convincing evidence that any of the respondent's statements on the Weekly Claim Questionnaires that he did not receive any compensation were fraudulent, dishonest, deceitful, or a misrepresentation of the facts.

"109.    The respondent also stipulated that he 'worked during many of the weeks in which he received benefits.' The respondent represented in the Weekly Claim Questionnaire for every week in exhibit 11 that he did not work during the weeks being claimed.

"110.    However, the Weekly Claim forms did not define what constituted 'work' for purposes of making the weekly claims, nor was there any instruction about how a self-employed professional would determine what type of work would need to be reported. For example, there was no indication whether an attorney should report all work or just billable hours worked.

"111.    The hearing panel concludes that there is not clear and convincing evidence that any of the respondent's statements on the Weekly Claim Questionnaires that he did not work were fraudulent, dishonest, deceitful, or a misrepresentation of the facts.

"112.    Missing instructions and definitions in the KDOL applications for an applicant who was a self-employed owner of a professional LLC left the respondent to interpret what was meant by undefined terms such as 'income,' 'gross income,' 'net income,' 'work,' and 'wages,' and how those terms applied to his situation. The evidence showed the respondent was not the only one who did not fully understand what the KDOL benefit applications were asking for.

"113.    The hearing panel does not interpret KRPC 8.4(c) to hold the respondent strictly liable for interpreting the meaning of unclear terms and questions in the PUA applications.

19

"114.    Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(c) by negligently misrepresenting his 2019 personal income. The hearing panel does not conclude there was any other violation of KRPC 8.4(c)

"*American Bar Association
Standards for Imposing Lawyer Sanctions*

"115.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"116.    *Duty Violated*. The respondent violated his duty to the public to accurately report information to KDOL and to the profession to act in a professional manner when interacting with a state agency.

"117.    *Mental State*. The respondent negligently violated his duty. The respondent's mental state was also impacted by alcoholism and the respondent's inability to maintain sobriety at the time of the misconduct.

"118.    *Injury*. As a result of the respondent's misconduct, the respondent caused injury to the public and to the profession by receiving public funds based on inaccurate information.

"119.    In addition to the above-cited factors in Standard 3, the hearing panel has thoroughly examined and considered the following Standard:

'5.13    Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.'

20

"120.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following with regard to aggravating factors:

"121.    *Dishonest or Selfish Motive.* The disciplinary administrator argues that the respondent exhibited a dishonest or selfish motive. The hearing panel does not find that this aggravating factor applies. While the respondent was negligent in not confirming accurate information on the PUA application, there is no evidence the respondent's conduct was motivated by dishonesty or selfishness.

"122.    *Pattern of Misconduct.* The disciplinary administrator argues that the respondent's weekly submission of inaccurate information and failure to correct the misinformation resulted in a pattern of misconduct. However, the hearing panel found that there was not clear and convincing evidence that the respondent's weekly claim responses violated the KRPC. The hearing panel concludes that this aggravating factor does not apply.

"123.    *Substantial Experience in the Practice of Law.* The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 2002. The respondent was admitted to the practice of law in Missouri in 1999. At the time of the misconduct, the respondent had been practicing law for around 20 years. The hearing panel concludes that the respondent had substantial experience in the practice of law when the misconduct occurred, and that this aggravating factor does apply.

"124.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"125.    *Absence of a Prior Disciplinary Record.* The respondent has not been previously disciplined. The hearing panel concludes that this is a mitigating factor.

21

"126.    *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* The respondent suffers from alcoholism. It is clear that the respondent's alcoholism contributed to his misconduct. Further, the respondent has shown that he has surrounded himself with support and has successfully remained sober for over 522 days. The hearing panel concludes that this is a mitigating factor.

"127.    *Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct.* The respondent entered into a repayment plan with KDOL once that option became available. The respondent has been paying KDOL $1,000 per month since the repayment plan began and plans to pay back the full amount KDOL says is owed, including the penalty. Further, the disciplinary administrator stated that the respondent made efforts to repay KDOL prior to the disciplinary complaint being filed. The hearing panel concludes that this is a mitigating factor.

"128.    *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. The disciplinary administrator's office acknowledged that the respondent has been accountable for his misconduct and has taken responsibility. The hearing panel concludes that this is a mitigating factor.

"129.    *Imposition of Other Penalties or Sanctions.* The respondent has experienced other sanctions for his conduct. The respondent was assessed a penalty of $8,569.00 by KDOL, which the respondent has agreed to pay as part of his repayment plan. The disciplinary administrator's office asserts that this mitigating factor does not apply, because the payment of this penalty is already considered under the mitigating factor of timely good faith effort to pay restitution above. However, the hearing panel concludes that the penalty is not repayment of restitution to KDOL but is a penalty as indicated by KDOL for not complying with the state's requirements for providing proper information to confirm his eligibility for benefits. The hearing panel concludes this is a mitigating factor.

22

"130.    *Remorse.* At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct. The respondent apologized to all who were harmed by his actions. The hearing panel concludes that this is a mitigating factor.

"131.    *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of his community. The respondent also enjoys the respect of his peers and his clients as shown in letters received by the hearing panel. The hearing panel concludes that this is a mitigating factor.

"*Recommendation of the Parties*

"132.    The disciplinary administrator recommended that the respondent be indefinitely suspended.

"133.    The respondent recommended that he receive a shorter suspension.

"*Discussion*

"134.    The hearing panel notes several additional factors it considered in reaching its conclusions and recommendations.

"135.    First, the COVID-19 pandemic created substantial uncertainty for all individuals across the globe. In the United States, various pandemic relief programs were enacted to prevent a nationwide collapse of the economy and ensure families could access essentials necessary for survival. Pandemic relief laws were passed with stated intention that they be interpreted liberally to provide relief. See 42 U.S.C. § 5121; 20 C.F.R. § 625.1.

"136.    Second, online checkbox forms, while promoting efficiency, do not allow an individual to provide additional information to explain a unique situation. At the time

23

of the respondent's misconduct, the PUA program was new and KDOL was in a position where it had to adjust its assistance application forms to accept applications from self-employed individuals.

"137.    However, the way a self-employed individual receives income can vary greatly from how an employed W2 wage earner receives income. The meaning of the terms 'wages,' 'income,' 'gross income,' and 'net income' can differ greatly between W2 employees and a self-employed owner of a solo Limited Liability Company. In particular, the PUA application instructions do not distinguish between income received by the LLC and income received by the owner, personally. The meaning of 'work' for a self-employed professional differs from the meaning of 'work' for a wage-earner. For a wage earner, it is simpler to distinguish the hours that the employee is on the clock working or has finished working for the day. A self-employed professional might spend many hours on the development of their business without expecting any direct compensation for those hours. Without further definition by KDOL, the respondent was left to interpret what these terms meant.

"138.    The lack of definitions on the KDOL forms for these terms limits the reader's ability to understand what is being requested. Further, the inability to add information to explain the reason for checking certain boxes limits the ability of the person filling out the form to explain their employment situation. The respondent's ability to accurately report his eligibility for benefits depended on the clarity of the instructions provided to him and opportunity to explain his circumstances.

"139.    There was no evidence that the respondent had the information requested by KDOL regarding his personal income for 2019 at the time he submitted the unemployment assistance application or the PUA application. The respondent's 2019 tax return was not filed until October 2020, and he filled out the application in May 2020. While the amount of personal income the respondent reported for 2019 ultimately misrepresented the facts, there is no evidence the respondent intended to defraud, deceive, or act dishonestly. See [In re] Buckner, 308 Kan. 427, 449, 421 P.3d 226 (2018), quoting In re Obert, 336 Or. 640, 89 P.3d 1173 (Or. 2004) (difference between the terms

24

in Rule 8.4(c) 'explained . . . by concluding that fraud and deceit require an intent to deceive, but misrepresentation does not, and that dishonesty involves "conduct indicating a disposition to 'lie, cheat or defraud.'"")[.]

"140. 'Merely providing inaccurate information can be consistent with [a] finding [of] [a respondent's] mental state that he 'negligently' violated his duty.' [*In re*] *Sutton*, 306 Kan. 503, 510, 394 P.3d 836 (2017). '[I]naccuracy is not necessarily indicative of dishonesty.' *Id.*

"141. Finally, the hearing panel concludes there was injury to the public and to the profession, as found above. However, as noted by the disciplinary administrator's office during the formal hearing, it is likely that the respondent would have qualified to receive some sort of unemployment assistance during the pandemic.

"142. The respondent, as the sole income earner in his family of six, received $38,076 in assistance in 2020 and 2021 through KDOL. According to KDOL's redetermination of PUA benefits based on the respondent's 2019 tax return, the respondent would have been entitled to receive $30,810. Thus, the respondent received $7,266 more than he would have been entitled to receive had he properly applied for PUA benefits. During the hearing, the parties indicated that the numbers reported in the Additional Joint Stipulation may have taken into account repayment already made by the respondent, so it is possible that the correct amount is approximately $4,000 higher than this.

"143. While KDOL properly determined the respondent was not entitled to these funds based on his lack of response and failure to provide material information when requested, there is not clear and convincing evidence that all of the funds the respondent received were funds that he would not have been entitled [to] if he had provided accurate information and applied in the manner required by KDOL.

25

"144. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be censured and that the censure be published in the Kansas Reports.

"145. Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

This disciplinary proceeding requires us to decide whether Stewart's negligent misrepresentation of self-employment income on a government benefits application constitutes professional misconduct under KRPC 8.4(c). We hold that it does. While the term "misrepresentation" is not defined in the Kansas Rules of Professional Conduct, its plain meaning, the structure of KRPC 8.4 itself, and our prior decisions support the conclusion that negligent misrepresentations—even if made outside the direct context of legal representation—fall within the scope of KRPC 8.4(c).

*Standard of review*

In a disciplinary proceeding, the court considers the evidence, the panel's findings, and the parties' arguments and determines whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Spiegel*, 315 Kan. 143, 147, 504 P.3d 1057 (2022); see Supreme Court Rule 226(a)(1)(A) (2025 Kan. S. Ct. R. at 275). Clear and convincing evidence is evidence that causes the factfinder to believe that the truth of the facts asserted is highly probable. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

A finding is considered admitted if exception is not taken. When an exception is taken, the finding is typically not deemed admitted so the court must determine whether it is supported by clear and convincing evidence. *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017). If so, the finding will not be disturbed. "The court does not reweigh conflicting evidence, assess witness credibility, or redetermine questions of fact when undertaking its factual analysis." *In re Solorio*, 319 Kan. 810, 821, 560 P.3d 1178 (2024).

Although parties in disciplinary cases may stipulate to rule violations, "the parties' agreements on conclusions of law are not binding on this court." *In re Gamble*, 319 Kan. 680, 690, 558 P.3d 290 (2024); *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 400, 266 P.3d 516 (2011) (stipulations as to legal conclusions are ineffective). "Whether submitted by evidence through an adversarial system or by uncontested agreement, we review it under the same standard—ascertaining the existence of clear and convincing evidence to support a legal conclusion." *Gamble*, 319 Kan. at 695.

*Legal framework*

The rule at issue is KRPC 8.4(c), which states that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The four types of conduct—dishonesty, fraud, deceit, and misrepresentation—are listed disjunctively, signaling that each constitutes a separate and independent basis for discipline.

In *In re Sutton*, 306 Kan. 503, 510, 394 P.3d 836 (2017), which was cited by the panel, we explicitly recognized that a violation of KRPC 8.4(c) may be based on a negligent misrepresentation. There, the attorney provided inaccurate information about a court order to school principals. The disciplinary panel found that the attorney acted negligently, and we affirmed a finding that the inaccurate statements constituted a misrepresentation, even absent a finding of intentional dishonesty. We distinguished

27

"dishonesty" as requiring intent but emphasized that "misrepresentation—a form of misconduct that is also covered by KRPC 8.4(c)—can be merely negligent." 306 Kan. at 510.

*Application of KRPC 8.4 to Stewart's case*

Stewart reported estimated self-employment income from the practice of law on a pandemic unemployment application that materially overstated his actual 2019 earnings. This misrepresentation resulted in a significant financial benefit to him. The hearing panel found that this statement was not intentionally false but resulted from Stewart's negligence in failing to verify the correct amount using available documentation. The panel found the negligent misstatement violated KRPC 8.4(c) and recommended published censure. The panel rejected the ODA's other asserted rule violations.

As explained above, a majority of this court holds that a violation of KRPC 8.4(c) based on an alleged misrepresentation must be proven by clear and convincing evidence to adversely reflect on the attorney's fitness to practice law. Applying that standard, a different majority of the court finds that clear and convincing evidence supports the panel's determination that Stewart's negligent misrepresentation of his income violated KRPC 8.4(c).

*The ODA's exceptions*

After the panel released the final hearing report, the ODA filed exceptions to numerous findings of fact and conclusions of law. When an exception is filed, the finding is not deemed admitted and we must independently determine whether it is supported by clear and convincing evidence. The court does not reweigh evidence or reassess credibility. *In re Hodge*, 307 Kan. at 209-10; *In re Solorio*, 319 Kan. at 821. With this standard in mind, we discuss each of the ODA's exceptions in turn.

28

1. *Negligent vs. intentional misrepresentation of 2019 income on PUA application*

The hearing panel concluded Stewart's income representation on the PUA application was negligent misrepresentation. The ODA takes exception with this legal conclusion, arguing it provided clear and convincing evidence at the hearing to establish that Stewart intentionally made dishonest statements on his PUA application. To that end, the ODA takes exception to the following conclusions of law:

"96.   The amount reported by the respondent to KDOL misrepresented the facts, and the respondent was negligent in not doing a more thorough job of determining what his 2019 net income was.

"97.   The hearing panel specifically concludes there was no evidence the respondent's misconduct was intentional or that he engaged in conduct involving fraud, dishonesty, or deceit regarding his representation of his 'income' on the PUA application.

"98.   In reaching this conclusion, the hearing panel considers the following: 1. There was no evidence that KDOL provided a clear definition on the PUA application form for the terms 'income,' 'gross income,' or 'net income' or specif[ied] exactly how a self-employed individual's 'income,' 'gross income,' or 'net income' should be calculated for purposes of the application; and 2. the PUA application was filled out by the respondent in May 2020 and his 2019 income tax return was not filed until October 2020, meaning there was no evidence the respondent knew what his actual net loss or profit from the Law Firm was when he filled out the PUA application.

. . . .

"117.   *Mental State*. The respondent negligently violated his duty. The respondent's mental state was also impacted by alcoholism and the respondent's inability to maintain sobriety at the time of the misconduct.

29

. . . .

"139.  There was no evidence that the respondent had the information requested by KDOL regarding his personal income for 2019 at the time he submitted the unemployment assistance application or the PUA application. The respondent's 2019 tax return was not filed until October 2020, and he filled out the application in May 2020. While the amount of personal income the respondent reported for 2019 ultimately misrepresented the facts, there is no evidence the respondent intended to defraud, deceive, or act dishonestly. *See [In re] Buckner*, 308 Kan. 427, 449, 421 P.3d 226 (2018), *quoting In re Obert*, 336 Or. 640, 89 P.3d 1173 (Or. 2004) (difference between the terms in Rule 8.4(c) 'explained . . . by concluding that fraud and deceit require an intent to deceive, but misrepresentation does not, and that dishonesty involves "conduct indicating a disposition to 'lie, cheat or defraud.'"")[.]"

We find clear and convincing evidence supports the hearing panel's finding that Stewart engaged in negligent conduct in misrepresenting his "income" on the PUA application, rather than intentional "conduct involving fraud, dishonesty, or deceit."

"The ABA Standards [for Imposing Lawyer Sanctions] identify three mental states: 'intent,' the highest culpable mental state; 'knowledge,' the intermediate culpable mental state; and 'negligence,' the least culpable mental state.' [Citation omitted.] The ABA Standards define intent as 'the conscious objective or purpose to accomplish a particular result,' while knowledge is defined as 'the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.' American Bar Association Annotated Standards for Imposing Lawyer Sanctions, xxi (2015)." *In re Buckner*, 308 Kan. 427, 452, 421 P.3d 226 (2018).

The ODA makes several arguments in an attempt to undermine the hearing panel's finding of negligence. First, the ODA argues Stewart never characterized his actions as negligent, but instead used the term "reckless," which suggests he acted with a higher culpability than mere negligence. But as Stewart replies, he used "reckless" to describe

his lifestyle, not when discussing his completion and filing of the PUA application. Instead, Stewart's testimony described his submission of the $30,000 quarterly earnings as an estimate that was "consistent with me just submitting a form without reading it." Moreover, Stewart's answer to the complaint explicitly argued his actions were negligent, rather than taken "in a fraudulent or deceitful fashion."

Second, using the ABA Standard's definition of intent, the ODA asserts Stewart acted with the "'conscious objective or purpose to accomplish a particular result.'" The ODA is correct that Stewart had a clear goal, which was to receive unemployment benefits. But the evidence presented does not support the claim that he had a clear goal to *dishonestly* receive unemployment benefits. To the contrary, as the hearing panel reasoned, the lack of definitions on the form meant the PUA application was not clear "how a self-employed individual's 'income,' 'gross income,' or 'net income' should be calculated for purposes of the application." This was supported by the KDOL appeals referee's comment that the distinction between net and gross receipts was "a common point of misunderstanding for a lot of PUA applicants." The panel also accurately noted Stewart had no access to his 2019 tax return at the time of application. This evidence supports the panel's finding that Stewart's conduct was careless and a mistake.

The ODA also suggests circumstantial evidence supports intentional misconduct. For example, it points to Stewart's failure to correct the PUA application after he completed the 2019 tax returns. But Stewart testified that he did not become aware of this discrepancy until after the KDOL reached out and explained they were beginning an investigation. He testified that he was aware of his 2019 income when he received the tax returns, but there is no evidence that he connected this awareness with the PUA application which was filed months before.

31

In sum, clear and convincing evidence supports the hearing panel's conclusion that Stewart violated KRPC 8.4(c) by negligently misrepresenting his 2019 income on the PUA application.

2. *Veracity of statement that the pandemic "shut [Stewart's] only client down"*

When Stewart applied for unemployment before the creation of the CARES Act, he stated on the relevant form that "[t]he COVID-19 virus has shut my only client down." The hearing panel concluded this statement did not violate KRPC 8.4(c). The ODA takes exception to the panel's conclusions, which are set forth in paragraphs 100, 101, and 102 of the hearing report:

"100.    The respondent confirmed during his testimony that he primarily represented only that sole client when the pandemic shut-downs began and that his client's business was closed for the foreseeable future. The hearing panel concludes there was not clear and convincing evidence presented that the client was not shut down by the COVID-19 virus.

"101.    Further, the hearing panel concludes that the conversion of the client's pending federal litigation representation to a contingent fee agreement does not make the respondent's statement on exhibit 4 dishonest. The conversion of that case to a contingent fee agreement did not change the fact that the respondent's client was unlikely to bring any further work to the respondent's firm for the foreseeable future after it had shut down.

"102.    The hearing panel concludes that there is not clear and convincing evidence the respondent's statement that '[t]he COVID-19 virus has shut [his] only client down' was fraudulent, deceitful, dishonest, or a misrepresentation of the facts."

We find clear and convincing evidence supports the panel's conclusion.

First, both the uncontested factual findings and the joint stipulation indicate that Stewart had a primary client. He helped a client with a land development deal, which established a business on the property. That business took off and became Stewart's primary client.

Second, both the uncontested factual findings and the joint stipulation note Stewart filed federal litigation on behalf of the business in 2017. In 2019, before the litigation ended, the client sold the business.

Third, both the uncontested factual findings and a joint stipulation note that toward the end of 2019, the client was concerned that they could not continue to pay for the litigation, so the client and Stewart converted the case to a contingency fee matter.

Fourth, the uncontested factual findings indicate Stewart obtained a judgment in the client's favor, and in March 2020 the case was transferred to the United States District Court for the District of Kansas to collect the judgment.

Fifth, Stewart testified before the hearing panel that he received "a letter indicating that my main client's operation had closed." This testimony came in response to a question from the presiding officer, who asked whether Stewart's decision to click a button indicating his place of employment was closed due to COVID-19 was intended to convey that Stewart's office was closed or instead was intended to convey that the "client that you did a bulk of the work for" was closed. In this context, Stewart's response suggests his client's main operations had closed due to COVID-19.

Despite these facts, the ODA argues the contingency fee arrangement, combined with Stewart's statement that nothing had been happening in the case for a while, suggest his decreased work and income were due to factors beyond the pandemic. But as the panel specifically found, conversion of the case to a contingent fee agreement is not

mutually exclusive from a claim that the pandemic affected his client's business to the point where future work was unlikely. It was the ODA's burden to show by clear and convincing evidence that Stewart's statement that the "pandemic shut [his] only client down" was dishonest, fraudulent, deceitful, or a misrepresentation. The ODA provided no evidence that he did not lose his client because of the pandemic. Based on Stewart's uncontroverted testimony to the contrary, we agree with the panel that the ODA failed to establish by clear and convincing evidence that Stewart engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation when he stated that his client was shut down due to COVID-19.

### 3. *Weekly certifications that Stewart did not work*

The next alleged violation relates to the weekly PUA forms Stewart was required to complete. The forms included questions asking whether applicants had worked during the week. Uncontested factual findings from the hearing report explain that Stewart filled out this weekly form each week from March 7, 2020, until September 4, 2021, and that on these forms he stated that he did not work except for one week during the period. The hearing panel concluded this did not violate KRPC 8.4(c).

As to this allegation, the ODA takes exception to the following factual finding paragraphs:

> "46.    The term 'work' was not defined in the weekly claim applications, nor was there any instruction about how a self-employed professional should determine what type of work needed to be reported. For example, there was no indication whether an attorney should report time the attorney spends on non-billable work, or whether the attorney should just report billable hours worked.
>
>     . . . .

"51.     As noted above, the KDOL weekly claim form did not specify what type of 'work' needed to be reported. The panel did not hear evidence regarding whether the work the respondent completed was hours for which the respondent could have received compensation.

　. . . .

"80.     During his testimony, when asked by members of the hearing panel what [was] incorrect or false about his applications to KDOL, the respondent was unable to identify what he told KDOL that was incorrect or false."

The ODA also takes exception to the following conclusions of law:

"109.     The respondent also stipulated that he 'worked during many of the weeks in which he received benefits.' The respondent represented in the Weekly Claim Questionnaire for every week in exhibit 11 that he did not work during the weeks being claimed.

"110.     However, the Weekly Claim forms did not define what constituted 'work' for purposes of making the weekly claims, nor was there any instruction about how a self-employed professional would determine what type of work would need to be reported. For example, there was no indication whether an attorney should report all work or just billable hours worked.

"111.     The hearing panel concludes that there is not clear and convincing evidence that any of the respondent's statements on the Weekly Claim Questionnaires that he did not work were fraudulent, dishonest, deceitful, or a misrepresentation of the facts.

"112.     Missing instructions and definitions in the KDOL applications for an applicant who was a self-employed owner of a professional LLC left the respondent to interpret what was meant by undefined terms such as 'income,' 'gross income,' 'net income,' 'work,' and 'wages,' and how those terms applied to his situation. The evidence

35

showed the respondent was not the only one who did not fully understand what the KDOL benefit applications were asking for. (See DA Ex. 1, para 2 ('this appears to have been a common point of misunderstanding for a lot of PUA applicants').)

"113. The hearing panel does not interpret KRPC 8.4(c) to hold the respondent strictly liable for interpreting the meaning of unclear terms and questions in the PUA applications.

"114. Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(c) by negligently misrepresenting his 2019 personal income. The hearing panel does not conclude there was any other violation of KRPC 8.4(c).

. . . .

"136. Second, online checkbox forms, while promoting efficiency, do not allow an individual to provide additional information to explain a unique situation. At the time of the respondent's misconduct, the PUA program was new and KDOL was in a position where it had to adjust its assistance application forms to accept applications from self-employed individuals.

"137. However, the way a self-employed individual receives income can vary greatly from how an employed W2 wage earner receives income. The meaning of the terms 'wages,' 'income,' 'gross income,' and 'net income' can differ greatly between W2 employees and a self-employed owner of a solo Limited Liability Company. In particular, the PUA application instructions do not distinguish between income received by the LLC and income received by the owner, personally. The meaning of 'work' for a self-employed professional differs from the meaning of 'work' for a wage-earner. For a wage earner, it is simpler to distinguish the hours that the employee is on the clock working or has finished working for the day. A self-employed professional might spend many hours on the development of their business without expecting any direct compensation for those hours. Without further definition by KDOL, the respondent was left to interpret what these terms meant.

"138.    The lack of definitions on the KDOL forms for these terms limits the reader's ability to understand what is being requested. Further, the inability to add information to explain the reason for checking certain boxes limits the ability of the person filling out the form to explain their employment situation. The respondent's ability to accurately report his eligibility for benefits depended on the clarity of the instructions provided to him and opportunity to explain his circumstances."

A review of the documents in the record shows the two fact-finding paragraphs, paragraphs 46 and 51, are supported by clear and convincing evidence. The hearing panel is correct that the forms do not define what "work" means, do not include instructions for self-employed professionals, and do not include information about whether attorneys should report billable hours, non-billable work, or both. And the hearing panel is also correct that no evidence was presented regarding whether Stewart's work during this period was work that could have led to compensation. At most, Stewart noted he completed work on the contingency fee matter during 2020.

On the other hand, Stewart stipulated to working during many of the weeks he received benefits, meaning he "worked" on weeks where he submitted forms saying he did not work. Exhibit 30, which is a document breaking down, among other things, Stewart's income and days worked during the relevant time period, indicates that Stewart performed work during 38 of the 77 weeks that he claimed he did not work. And during the hearing, the presiding officer asked Stewart what false statement he made. Stewart replied:

"A. I submitted the applications indicating that I hadn't worked that week.

"Q. And you did?

"A. Yeah."

But the hearing panel's reasoning provides important context to this evidence. Stewart stipulated to completing work in the general sense, but the forms were still unclear about whether the "work" Stewart completed was the type of work Stewart was required to acknowledge. In support of this, Stewart's answer to paragraph 18 of the complaint notes his answers were not deliberately false because, based on a definition of unemployment found in K.S.A. 44-703(m), his work occurred in weeks where he would not receive any wages because of the contingency fee arrangement.

4. *Weekly certifications that Stewart did not receive income*

Similarly, the final asserted violation is related to Stewart's answers to questions about income on the same weekly claim form. Like his work answers, Stewart indicated on his forms that he was not receiving compensation during the relevant time. The hearing panel found this did not violate KRPC 8.4(c).

As for this sub-issue, the ODA takes exception to the following factual finding paragraphs:

"36.    For purposes of this final hearing report, the hearing panel will use the term 'gross receipts of the Law Firm' to refer to payments received by the Law Firm, such as the amount referenced on Line 1 of Schedule C of the respondent's 2019 income tax return. The panel will refer to the 'net income of the Law Firm' to refer to payments received by the Law Firm minus the Law Firm's expenses, such as the amount referenced on Line 31 of Schedule C of the respondent's 2019 income tax return. When referring to the income the respondent personally received from the Law Firm, the hearing panel will use the term 'personal income.' Based on the evidence, the respondent took draws from the LLC as opposed to paying himself wages, so the term 'wages' does not apply to his situation.

. . . .

38

"52.     The respondent represented in his applications that he did not receive any personal income during all but one of the weeks. The Law Firm had received eight separate payments of more than $120,000 in compensation from clients during this time period. The payments totaling $124,881.00 represent gross receipts of the Law Firm, not the respondent's personal income.

. . . .

"54.     Through the hearing panel's questioning of the respondent during the formal hearing, the respondent confirmed that receipt of payment from clients to the Law Firm totaling more than $120,000 did not equate to the amount of personal income he received. The respondent acknowledged that Law Firm's gross receipts is different from personal income and that Law Firm expenses and other circumstances factor into the amount finally received by him as personal income.

. . . .

"79.     Upon questioning by the hearing panel, the respondent acknowledged that the $74,275 in payments was gross receipts of the Law Firm, not personal income received by the respondent. There was no evidence presented regarding what the Law Firm's expenses were for 2020, or whether those expenses were more than or less than the Law Firm's gross receipts. The respondent's 2020 income tax return was not presented as evidence to the hearing panel, nor was any evidence of what amount of personal income the respondent received from the Law Firm."

The ODA also takes exception to the following conclusions of law:

"105.     The respondent stipulated that between March 7, 2020, and April 3, 2021, he received eight separate payments of more than $120,000 in compensation from clients. However, the hearing panel learned from exhibit 30 and the respondent's testimony that the $124,881.00 was not personal compensation to the respondent, but payments received by the Law Firm. Additionally, the full $124,881.00 was not received before April 3, 2021.

"106.    As noted above, the hearing panel asked the respondent about the $74,275 received by the Law Firm in 2020 and learned that this was not compensation received by the respondent, personally, but gross receipts of the Law Firm. There was no evidence regarding what the Law Firm's expenses were for 2020 or whether those expenses were more than or less than the Law Firm's gross receipts. The respondent's 2020 income tax return was not presented as evidence to the hearing panel. As a result, there was not clear and convincing evidence that the respondent received any personal income in 2020 that was not reported on the Weekly Claim Questionnaires.

"107.    There also was not clear and convincing evidence that the respondent received any personal income in 2021.

"108.    Because of this, the hearing panel concludes that there is not clear and convincing evidence that any of the respondent's statements on the Weekly Claim Questionnaires that he did not receive any compensation were fraudulent, dishonest, deceitful, or a misrepresentation of the facts.

. . . .

"137.    However, the way a self-employed individual receives income can vary greatly from how an employed W2 wage earner receives income. The meaning of the terms 'wages,' 'income,' 'gross income,' and 'net income' can differ greatly between W2 employees and a self-employed owner of a solo Limited Liability Company. In particular, the PUA application instructions do not distinguish between income received by the LLC and income received by the owner, personally. The meaning of 'work' for a self-employed professional differs from the meaning of 'work' for a wage-earner. For a wage earner, it is simpler to distinguish the hours that the employee is on the clock working or has finished working for the day. A self-employed professional might spend many hours on the development of their business without expecting any direct compensation for those hours. Without further definition by KDOL, the respondent was left to interpret what these terms meant.

40

"138.     The lack of definitions on the KDOL forms for these terms limits the reader's ability to understand what is being requested. Further, the inability to add information to explain the reason for checking certain boxes limits the ability of the person filling out the form to explain their employment situation. The respondent's ability to accurately report his eligibility for benefits depended on the clarity of the instructions provided to him and opportunity to explain his circumstances."

We agree with the hearing panel that there was not clear and convincing evidence that Stewart's representations violated KRPC 8.4(c). As for the findings of fact, Stewart testified how any income coming in during 2020 and 2021 went to his law firm, which was an LLC. The record includes his 2019 tax return which lists the business name "Stewart Law Firm, L.C." During 2020 and 2021, Exhibit 30 indicates Stewart received around $124,000 over the two years, but he testified that this went to the firm, not him personally. For example, in 2020 the firm received a large payment of around $72,000 in October, which was money from the contingency fee case that Stewart was not sure would ever be recovered. The hearing panel was also correct that no evidence of the firm's expenses was presented, the 2020 and 2021 tax returns were not in evidence, and there is no evidence related to what amount of personal income Stewart received from the firm.

The ODA, however, points to testimony where Stewart suggests he took out firm money and used it for himself. The following exchange occurred:

"[ODA]:  When your law firm received [the $72,000 check] some of the money would be expenses and bills, right?

"[Stewart]:  Right.

"[ODA]:  But some of it was money that went directly to you that you then spent for your personal uses, device—divided from the firm, right?

"[Stewart]:  Yes.

"[ODA]:  And maybe that did not happen the same week, but it would have happened in 2020 at some point that you actualized the money?

"[Stewart]:  I don't recall how long it stayed in that Stewart Law Firm account and when the check would have been—or checks issued to me, but . . .

"[ODA]:  But, yes, probably?

"[Stewart]:  Yes.

"[ODA]:  Okay. And—but you told the Department of Labor through those weekly forms you did not receive compensation for whatever week that ended up being in, correct?

"[Stewart]:  Right.

"[ODA]:  And the same is true for those other weeks that your firm received money that then you actualized—you actualized it but you told the Department of Labor you did not get compensation that week, right?

"[Stewart]:  Correct."

The ODA suggests this exchange was overlooked by the hearing panel. But the ODA is impermissibly asking this court to reweigh conflicting evidence. First, as Stewart argues, one way of reading this transcript is that Stewart was affirming that he "probably" actualized the money, which likely fails to meet the standard of clear and convincing evidence. Second, at one point Stewart agreed that between 2020 and 2021 the only benefits or money he received "was from unemployment or PUA benefits." Thus, he appears to provide contradictory testimony about whether he actualized any of the money

42

coming into the firm. With this confusing and potentially contradictory testimony, the hearing panel was best positioned to ascertain Stewart's credibility and weigh the evidence.

The ODA points to paragraph 19 in the first joint stipulation, which notes that Stewart "actually received eight separate payments of more than $120,000 in compensation from clients during this time period." But again, these payments were to the firm, not Stewart personally.

The ODA also argues, contrary to the hearing panel's conclusions of law, that the form was clear that KDOL "wanted to know about any kind of renumeration they received during the reporting week" and again relies on the common meaning of the words on the form. The confusion caused by questions of the meaning of "work" is likely higher than the confusion caused by the term "income," which suggests this sub-issue is likely a closer call than the one directly above. It is hard to imagine a situation where actualizing money in this context would not qualify as income. But, ultimately, there was not clear and convincing evidence that Stewart personally received income based on the seemingly contradictory testimony and the lack of evidence presented by the ODA that he *did* actualize money, beyond the aforementioned testimony. Thus, we agree with the panel that clear and convincing evidence does not support a KRPC 8.4(c) violation in this sub-issue.

5. *KDOL's default finding*

Finally, the ODA makes arguments related to KDOL's findings. The ODA takes exception to the following findings and claims that paragraph 143 contradicts paragraph 70:

"70.     On October 19, 2021, KDOL emailed the respondent a Notice of Determination explaining that he had been disqualified for PUA benefits because he 'knowingly made a false statement or allowed another to do so, or [he] failed to provide the required information, in order to obtain benefits to which [he] was not entitled.' The hearing panel notes that there was no affirmative determination by KDOL that the respondent knowingly provided false information, but rather KDOL made a default finding on one of these three alternative bases.

　　　　. . . .

"75.     The respondent did not appear at the scheduled hearing. The Appeals Referee issued a default order upholding both the finding of fraud and the redetermination. Specifically, the order stated: 'Claimant is not eligible for PUA beginning February 23, 2020, because Claimant knowingly made a false statement or allowed another to do so, or failed to provide information, in order to obtain benefits to which Claimant was not entitled.' The referee also filed a complaint with the Office of the Disciplinary Administrator (ODA). Again, the hearing panel notes that there was no affirmative determination by the Appeals Referee that the respondent knowingly provided false information, but rather made a default finding on one of these three alternative bases.

　　　　. . . .

"143.    While KDOL properly determined the respondent was not entitled to these funds based on his lack of response and failure to provide material information when requested, there is not clear and convincing evidence that all of the funds the respondent received were funds that he would not have been entitled [to] if he had provided accurate information and applied in the manner required by KDOL."

The ODA suggests the hearing panel's choice to reject KDOL's fraud finding ignored the evidence. As paragraph 70 indicates, KDOL determined Stewart "knowingly made a false statement or allowed another to do so, or [he] failed to provide required

44

information, in order to obtain benefits to which [he] was not entitled." The ODA takes aim at the hearing panel's decision to discard KDOL's determination because it rested on a default finding.

But even if the hearing panel's reasoning was incorrect, KDOL's finding is not clear and convincing evidence establishing a rule violation. First, the ODA provides no authority for the idea that a disciplinary hearing panel would be bound by KDOL's default determination. Second, the disciplinary hearing panel's findings of fact and conclusions of law were based on joint stipulations, exhibits, Stewart's testimony, and more. The KDOL's findings, on the other hand, had a more limited evidentiary basis. Thus, we are not persuaded by the ODA's argument.

6. *Aggravating factors*

The hearing panel found that the aggravating factors of a pattern of misconduct and dishonest or selfish motive were not applicable to Stewart. "While the panel is not required to support aggravating and mitigating circumstances with clear and convincing evidence, some evidence of those circumstances still must be presented for weighing." *In re Hall*, 304 Kan. 999, 1014, 377 P.3d 1149 (2016).

Here, the ODA takes exception to the following conclusions of law:

> "121. *Dishonest or Selfish Motive*. The disciplinary administrator argues that the respondent exhibited a dishonest or selfish motive. The hearing panel does not find that this aggravating factor applies. While the respondent was negligent in not confirming accurate information on the PUA application, there is no evidence the respondent's conduct was motivated by dishonesty or selfishness.

"122. *Pattern of Misconduct*. The disciplinary administrator argues that the respondent's weekly submission of inaccurate information and failure to correct the misinformation resulted in a pattern of misconduct. However, the hearing panel found that there was not clear and convincing evidence that the respondent's weekly claim responses violated the KRPC. The hearing panel concludes that this aggravating factor does not apply."

As we conclude above, Stewart's actions were not dishonest, but stemmed from confusion, carelessness, and mistakes, which were compounded by his daily drinking and the COVID-19 pandemic. At one point, Stewart's counsel corrected him in the following way:

"[Stewart]: Well, I was just—just a reckless style of living. These were . . .

"[Counsel]: Well, this is more than reckless, this is dishonest. You've agreed to that, right?

"[Stewart]: Yeah."

The hearing panel heard this testimony, as well as the other testimony describing his actions. To increase the relative importance of this testimony over the other findings of fact would likely amount to a reweighing of evidence. A minority of the court agrees with the Disciplinary Administrator on this point, however.

As we also concluded, there is not clear and convincing evidence that the weekly forms constitute rule violations. As a result, the misconduct was limited to the 2019 quarterly income representation on the PUA application. Thus, there was no pattern of misrepresentation.

*Appropriate discipline*

The final issue is the appropriate discipline. Before the hearing panel, the ODA argued indefinite suspension was appropriate, while Stewart argued for a shorter suspension. The hearing panel recommended published censure. In the briefs before this court, the ODA once again recommends indefinite suspension, and Stewart suggests the hearing panel was correct regarding published censure. We hold the appropriate discipline for Stewart's negligent misrepresentation is published censure.

In doing so, we note that Stewart did not make this misrepresentation in the context of representing a client. But KRPC provisions instruct us that attorneys may be punished for acts outside of formal representation. See Supreme Court Rule 203(a) (2025 Kan. S. Ct. R. at 247) ("An attorney is required to act at all times, both professionally and personally, in conformity with the standards established by the Kansas Rules of Professional Conduct, the Rules Relating to Discipline of Attorneys, and the attorney's oath of office."); Supreme Court Rule 203(b) (2025 Kan. S. Ct. R. at 247) ("Misconduct is a ground for discipline, regardless of whether the act or omission occurred in the course of an attorney-client relationship."); *In re Mintz*, 298 Kan. 897, 907, 317 P.3d 756 (2014) ("In many cases, we have recognized that violations of the KRPC can occur for dishonest conduct outside the practice of law."); *In re Kline*, 298 Kan. 96, 119, 311 P.3d 321 (2013) ("[L]awyers can be disciplined for conduct outside the profession if the conduct 'functionally relates' to the practice of law."). Similarly, we have held that a lawyer's actions reflect adversely on his or her ability to practice law when he or she engages in conduct that diminishes "'the trust and confidence that the public may reasonably be expected to place in a lawyer.' [Citation omitted.]" See *In re Frahm*, 291 Kan. 520, 527, 241 P.3d 1010 (2010) (explaining why criminal conduct that does not "relate directly to the practice of law" is sufficiently connected to the lawyer's professional fitness).

In recommending published censure, the panel cited ABA Standard 5.13, which allows published censure or reprimand for a misrepresentation "that adversely reflects on the lawyer's fitness to practice law." The panel referred to Stewart's misrepresentation using this language about his fitness to practice law during the time he filed his income report. Indeed, our caselaw reflects situations where we have sanctioned attorneys after they—either by silent or express misrepresentation—failed to properly report income to the government. In these situations, we have held the attorney harmed the public and "caused actual harm to the legal profession." See, e.g., *In re Busch*, 287 Kan. 80, 87, 194 P.3d 12 (2008) (discussing KRPC 8.4[b] and collecting several cases).

Likewise, here, Stewart admittedly made a misrepresentation to a government entity about his income from the practice of law, albeit a misrepresentation that did not result in a criminal conviction. Despite the criminality distinction from *Busch* and similar cases, at the time Stewart filed his report with the Kansas Department of Revenue he was not in a position where he was capable of practicing law—either for himself or others. He told us, "I had traded everything that I had loved and worked for, my family, for alcohol, it reigned and ruled my life. We talk about the statements of income. I—I guess I didn't care at the time." In essence, during the time covered by this case, Stewart's negligent misrepresentation about his income from the practice of law—a misrepresentation he stipulated to making—reflected his indifference to the characteristics necessary to practice law. We thus agree with the hearing panel that the ABA Standards for Imposing Lawyer Sanctions, Standard 5.13, applies because Stewart knowingly made a negligent misrepresentation that adversely reflects on his fitness to practice law.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Shawn Stewart is disciplined by published censure in accordance with Supreme Court Rule 225(a)(5) (2025 Kan. S. Ct. R. at 274) for violating KRPC 8.4(c).

48

IT IS FURTHER ORDERED that the costs of these proceedings shall be assessed to Stewart and that this opinion be published in the official Kansas Reports.

WILSON, J., not participating.

\* \* \*

LUCKERT, J., concurring: I write separately to concur generally with the majority holdings. Specifically, I agree that:

- Shawn E. Stewart made a negligent misrepresentation when, as found by the disciplinary hearing panel, he "misrepresented the amount of his 2019 net income on the [Pandemic Unemployment Assistance (PUA)] Questionnaire."

- In doing so, he violated Kansas Rule of Professional Conduct (KRPC) 8.4(c) (2025 Kan. S. Ct. R. at 426) (misconduct), which prohibits an attorney from making a misrepresentation.

- And he should be subjected to the discipline of published censure.

I fully agree with the rationale of the first opinion, as far as it goes. This means I agree we can order published censure of Stewart based on Standard 5.13 of the American Bar Association's Standards for Imposing Lawyer Sanctions. But given the broader discussion that separates the court in this decision, I write to clarify that I agree with the view that the Office of the Disciplinary Administrator must present clear and convincing evidence that *any* misrepresentation challenged under KRPC 8.4(c) must reflect adversely on the lawyer's fitness to practice law.

49

In reaching this determination, I find ambiguity in the wording of KRPC 8.4(c) and discern that the framers of the ABA's model version of 8.4(c) intended that a lawyer should be professionally answerable only when the lawyer's conduct reflects adversely on the lawyer's ability to practice law. In my view, this is largely reflected in their comments. See, e.g., ABA Rule 8.4, Comments [2] (criminal liability for violations of law "reflect adversely on fitness to practice law," "that indicate lack of those characteristics relevant to law practice," or that "indicate indifference to legal obligation"); [4] ("Conduct related to the practice of law includes representing clients; interacting with witnesses, coworkers, court personnel, lawyers and others while engaged in the practice of law; operating or managing a law firm or law practice; and participating in bar association, business or social activities in connection with the practice of law."); [7] (discussing duty of those in public office and those holding "private trust such as trustee, executor, administrator, guardian, agent and officer, director or manager of a corporation or other organization"). While Kansas has not adopted all these comments, we have adopted enough that I read this same intent into the adoption of our rule. See KRPC 8.4, Comment [2] (same); Comment [4] (same as ABA Comment [7]).

Most important to this decision, I agree that Stewart's misrepresentation and the circumstances surrounding him at the time he made the misrepresentation, by his own admission, reflected on his overall inability to represent even himself or the corporation he administered and certainly any clients. I thus concur with the decisions that the ODA presented clear and convincing evidence of the KRPC 8.4(c) violation and that Stewart should be disciplined by published censure.

ROSEN, C.J., joins the foregoing concurring opinion in part.

* * *

ROSEN, C.J., concurring in part and dissenting in part:  I join the first two majority holdings and Justice Luckert in her concurrence to the same. I write separately to dissent from the majority's holding that Stewart's behavior amounted to only a single violation of KRPC 8.4(c) (2025 Kan. S. Ct. R. at 426). I would hold there were more. See *In re Stewart*, 321 Kan. at ___, slip op. at 61-68, joining Part Two (Biles, J., concurring in part and dissenting in part).  Nonetheless, I join the decision to impose only published censure due to the mitigating circumstances in this case.

* * *

BILES, J., concurring in part and dissenting in part:  I agree with my colleagues (the "first" majority consisting of Chief Justice Rosen and Justices Luckert, Standridge and myself) that Stewart violated the rules of professional conduct and published censure is the appropriate discipline. I write separately on three points of disagreement, fully recognizing I'm just adding to the fractious discourse marring this court's disposition.

In Part One, I explain why I dissent from the holding that misrepresentation under Kansas Rule of Professional Conduct 8.4(c) (2025 Kan. S. Ct. R. at 426) requires separate proof to show it adversely reflects on a lawyer's fitness to practice law. That's not what the rule says. In Part Two, I address why the evidence supports the Office of the Disciplinary Administrator's exceptions to some conclusions by the hearing panel. In Part Three, I offer a counter perspective on my two colleagues' pejorative notions about our disciplinary process and what I write here.

Throughout, I emphasize that attorney discipline remains solely within this court's authority, and any real concerns should be handled through our rulemaking process to ensure our expectations are shaped by vital input from the bar and the public. After all,

51

judicial branch administration is our job, and it is best done in this instance through traditional rulemaking. See *Hays v. Ruther*, 298 Kan. 402, Syl. ¶ 11, 409, 313 P.3d 782 (2013) (holding "[i]t is the exclusive constitutional province of the Kansas Supreme Court to restrict or restrain an attorney in the exercise of that attorney's license to practice law"; relying on article 3, section 1 of the Kansas Constitution); *Martin v. Davis*, 187 Kan. 473, Syl. ¶ 3, 357 P.2d 782 (1960) ("The practice of the law is so intimately connected and bound up with the exercise of judicial power in the administration of justice that the right to regulate the practice naturally and logically belongs to the judicial department of the government.").

PART ONE: ADDING AN EXTRA ELEMENT TO KRPC 8.4(C)

In an odd twist from our usual adjudications, a "second" majority (consisting of Chief Justice Rosen and Justices Luckert, Stegall, and Wall), distinct from the one concluding Stewart deserves published censure for violating KRPC 8.4(c), declares a misrepresentation prosecuted under KRPC 8.4(c) requires additional proof that it adversely reflects on a lawyer's fitness to practice law. 321 Kan. at __, slip op. at 28. My problem is that neither KRPC 8.4(c)'s plain text nor its obvious structure supports this discrete element of proof.

We interpret Kansas Supreme Court Rules by adhering to the rule's plain text. See *In re Kline*, 298 Kan. 96, 117-19, 311 P.3d 321 (2013) (examining the text of KRPC 8.4[c] to reject imposing an additional requirement that misconduct be "'egregious and flagrantly violative of accepted professional norms'" or committed with "malevolent intent" to be actionable); *In re Pyle*, 283 Kan. 807, 827-28, 156 P.3d 1231 (2007) (relying on the rule's plain language when addressing whether an attorney violated KRPC 8.4[d]). The second majority ignores this basic tenet of textual interpretation to advance a less clear and more outcome-oriented analysis.

KRPC 8.4 provides:

"It is professional misconduct for a lawyer to:

"(a) Violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

"(b) *commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects*;

"(c) *engage in conduct involving dishonesty, fraud, deceit or misrepresentation*;

"(d) engage in conduct that is prejudicial to the administration of justice;

"(e) state or imply an ability to influence improperly a government agency or official;

"(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

"(g) *engage in any other conduct that adversely reflects on the lawyer's fitness to practice law*." (Emphases added.)

A proper reading of KRPC 8.4 identifies subsection (a) through (f) as six specific categories of professional misconduct. Subsection (g) captures any other conduct that adversely reflects on a lawyer's fitness to practice law. But only subsections (b) and (g) call for explicit assessment on how the misconduct "reflects on" that lawyer's fitness, so the rule's text and structure unambiguously confine this deeper evidentiary inquiry to those two subsections. By contrast, subsection (c), which is the provision relevant here, flatly prohibits "conduct involving dishonesty, fraud, deceit or misrepresentation" without further qualification. These differences necessarily carry meaning.

This deliberate omission in KRPC 8.4(c) signals that "dishonesty, fraud, deceit or misrepresentation" are so inherently damaging to the legal profession that no further showing is necessary. Its language is clear. Had the rule's drafters intended to demand additional proof of a lawyer's unfitness for every form of misconduct, they would have included that language in the opening clause, not just subsections (b) and (g) specifically. See *Kansas Judicial Review v. Stout*, 287 Kan. 450, 459, 196 P.3d 1162 (2008) (noting the same statutory interpretation principles apply to Supreme Court rules); *In re Lietz Const. Co.*, 273 Kan. 890, Syl. ¶ 12, 47 P.3d 1275 (2002) (recognizing the canon of statutory construction that courts "presume that when the legislature expressly includes specific terms, it intends to exclude any items not expressly included in the specific list" in a tax case); cf. 82 C.J.S. Statutes § 369 ("Each word or phrase is presumed to have a purpose and to have been included for a reason, and the act of choosing carefully some words necessarily implies others are omitted with equal care.").

But the drafters chose not to apply that qualifier in subsection (c), so inserting additional language perverts established principles of textual interpretation. See *State v. Smith*, 309 Kan. 929, Syl. ¶ 3, 441 P.3d 472 (2019) ("When the legislative intention is clear and unmistakable, an appellate court . . . cannot delete vital portions from a statute or supply vital omissions. No matter what the Legislature may have intended to do, if it did not in fact do so under any reasonable interpretation of the language used, the defect is one the Legislature alone can correct."). I would stick to our traditional approaches.

The second majority argues reading the rule as written leads to absurd results by treating any misrepresentation—however slight and regardless of its connection to a lawyer's fitness to practice law—as professional misconduct. 321 Kan. at __, slip op. at 77-79 (Stegall, J., concurring in part and dissenting in part). But that misunderstands and trivializes our methodical, multi-stage disciplinary system. And, just as importantly, this feared absurdity is unsupported by real-life examples taken from the many hundreds of disciplinary matters processed in Kansas.

54

In this state's implementation of attorney discipline, minor mistakes or conduct lacking meaningful bearing on a lawyer's professional fitness—such as the "'puffs,'" and "'white lies'" troubling the second majority—simply do not trigger disciplinary action under our rules, which we have made clear from the start. See KRPC Scope [14] (2025 Kan. S. Ct. R. at 315) ("The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself."); 321 Kan. at __, slip op. at 75 (Stegall, J., concurring in part and dissenting in part). So what justifies changing our rules *now*, through this judicial pronouncement in Stewart's case rather than using our routine rulemaking process? See generally Rules Open for Comment, available at https://kscourts.gov/Rules-Orders/Rules-Open-for-Public-Comment (accepting public comment on proposed new or amended rules). The second majority leaves this anomaly unexplained.

Let's reflect on how our existing "rules of reason" apply when a question of lawyer discipline arises. The process begins only after alleged misconduct is reported to the Disciplinary Administrator. Supreme Court Rule 208(a) (2025 Kan. S. Ct. R. at 255) ("An initial complaint or a report of attorney misconduct must be submitted to the disciplinary administrator."). The Disciplinary Administrator, like the court itself, is not a "roving commission" out looking for opportunities to pass judgment on a lawyer's ethics. See *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). It is a passive process initiated in reaction to a report, not proactive policing, except perhaps the random monitoring of law firm trust accounts. See Supreme Court Rule 236 (2025 Kan. S. Ct. R. at 301) (enabling the Disciplinary Administrator to conduct a compliance examination of any trust accounts). But that's not what is at issue.

After receiving a complaint, the Disciplinary Administrator determines whether to investigate or dismiss it without any investigation because it is facially frivolous, factually inadequate, duplicative, or outside the disciplinary board's jurisdiction. Rule

55

208(b). The Disciplinary Administrator is appointed by this court to exercise this gatekeeping function. Supreme Court Rule 205(a) (2025 Kan. S. Ct. R. at 248). Relevant here, no one asserts the Disciplinary Administrator should have declined to investigate Stewart or determined the initial complaint from the Kansas Department of Labor hearing officer was facially frivolous or factually inadequate. And the record before this court does not suggest otherwise. From my perspective, so far, so good.

A complaint warranting investigation proceeds under a formal process outlined in Supreme Court Rule 209(a) and (b) (2025 Kan. S. Ct. R. at 256). These investigations are conducted by the Disciplinary Administrator's office, a state or local bar association's ethics and grievance committee, or an attorney appointed for that purpose, and any relevant findings are reported to the Disciplinary Administrator in writing. From that report, the Disciplinary Administrator prepares a summary and makes recommendations to a separate review committee. Rule 209(c)-(d).

This review committee, consisting of three Kansas attorneys selected by this court specifically for screening disciplinary actions, considers the docketed complaint, the respondent's written reply, the investigative report, any relevant attachments, and the Disciplinary Administrator's summary and recommendations. See Supreme Court Rules 204(b) & 211(a) (2025 Kan. S. Ct. R. at 248, 257); Internal Operating Rules of the Kansas Board for Discipline of Attorneys, B.1. (2025 Kan. S. Ct. R. at 306). The review committee can, by majority vote, (1) dismiss the complaint for lack of probable cause, (2) dismiss the complaint for lack of clear and convincing evidence, (3) refer the respondent to the attorney diversion program, (4) issue an informal admonition to the respondent, or (5) forward the matter to a separate hearing panel. Rule 211(a). Any action other than dismissal requires the screening panel "find probable cause to believe that the respondent engaged in misconduct." Rule 211(b). Here, no one asserts any incorrect steps through Stewart's probable cause stage. Again, from my perspective, so far, so good.

Simply put, these initial steps ensure minor mistakes with no bearing on the legal profession are screened out—a reality unlikely to escape notice among the many qualified attorneys practicing in Kansas. The notion that our disciplinary process is stacked against an unwitting lawyer who boasts about how big a fish they caught on vacation is so far-fetched it defies common sense. See 321 Kan. at __, slip op. at 75 (Stegall, J., concurring in part and dissenting in part). And as a Kansas bar member since 1978, I have witnessed this gatekeeping function work as designed. Cf. KRPC Preamble [12] (2025 Kan. S. Ct. R. at 314) ("The legal profession's relative autonomy carries with it special responsibilities of self-government. The profession has a responsibility to assure that its regulations are conceived in the public interest. . . . Every lawyer is responsible for observance of the Rules of Professional Conduct. . . . Neglect of these responsibilities compromises the independence of the profession and the public interest which it serves."); *In re Gamble*, 319 Kan. 680, 558 P.3d 290 (2024) ("[E]quating a disciplinary complaint with 'crying in baseball' reduces the honorable and ethical duty of our profession to self-regulate into a toddler's outburst.").

Only after all these preliminary steps can a complaint move beyond the screening stage to a separate hearing panel (typically comprised of two disciplinary board members and an at-large, nonboard Kansas lawyer) that hears from both sides before issuing its recommendations. This is where the second majority feels compelled to save the day and protect against a nonexistent deluge of inconsequential accusations. And it does this by distorting the rule's plain text and structure and then amending it by judicial fiat rather than following the proper rulemaking process. This is not the way we should conduct our business.

I also take issue with the second majority's failure to seek additional briefing from the parties before fixing its perceived vital omissions in KRPC 8.4(c), simply because it deems it right. See *Smith*, 309 Kan. 929, Syl. ¶ 3; 321 Kan. at __, slip op. at 28. On many occasions, this court has expressed its displeasure in proceeding without the parties'

input, yet this second majority dispenses with such simple fairness without explanation—even as some on the court acknowledge this steps into novel interpretive territory. See 321 Kan. at ___, slip op. at 72 (Stegall, J., concurring in part and dissenting in part) ("[W]e have never thoroughly analyzed the meaning of the word 'misrepresentation' in the code."); e.g., *City of Wichita v. Trotter*, 316 Kan. 310, 322, 514 P.3d 1050 (2022) (holding Court of Appeals "overstepped its role" by deciding an issue not raised by the parties and not giving them an opportunity "to respond in any way other than through spur of the moment answers in oral arguments"); *Lumry v. State*, 305 Kan. 545, 566, 385 P.3d 479 (2016) ("As we have previously cautioned, when 'an appellate court raises a new issue *sua sponte*, counsel for all parties should be afforded a fair opportunity to brief the new issue and present their positions to the appellate court before the issue is finally determined.'"); *Lumry*, 305 Kan. at 574 (Biles, J., concurring) (writing separately to criticize the dissent's advocacy sua sponte for a dispositive test "never before used in this state's jurisprudence or even argued by the parties"); *State v. Puckett*, 230 Kan. 596, Syl. ¶ 2, 640 P.2d 1198 (1982) ("Where an appellate court raises a new issue sua sponte, counsel for all parties should be afforded a fair opportunity to brief the new issue and to present their positions to the appellate court before the issue is finally determined."). The failure to solicit the parties' input here sets bad precedent.

Finally, it's unclear whether the second majority's holding overrules prior decisions. It doesn't say it does, so one would reasonably assume no precedent is disturbed today. After all, overruling precedent is a weighty act that demands careful and plain-spoken explanation. See *State v. Sherman*, 305 Kan. 88, Syl. ¶ 2, 378 P.3d 1060 (2016) ("Once a point of law has been established by a court, it will generally be followed by the same court . . . in subsequent cases when the same legal issue is raised. Stare decisis operates to promote system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court."). Our practice has been to carefully and thoroughly analyze prior caselaw when departing from it. See, e.g., *State v. Reynolds*, 319 Kan. 1, 6-17, 552 P.3d 1 (2024); *Hilburn v. Enerpipe Ltd.*, 309

58

Kan. 1127, 1133-44, 442 P.3d 509 (2019); *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-10, 214 P.3d 676 (2009); *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 523-29, 154 P.3d 494 (2007).

Still, it seems reasonable to ask or at least anticipate whether prior decisions of this court remain good law, since that question surely lies ahead. Take *In re Kline*, for example. There, a former attorney general unsuccessfully battled the recommended indefinite suspension. He argued KRPC 8.4 "must be 'cabined' or constrained by narrowing principles" to limit this court's application of the KRPC and, "ensure that the rules are '[c]lear, [o]bjective, and [p]redictible.'" 298 Kan. at 114. To that end, Phillip Kline contended there could be no violation of KRPC 8.4(c), (d), and (g) unless the attorney's conduct was "'egregious and flagrantly violative of accepted professional norms that would be recognized by a reasonable attorney practicing in the same situation.'" 298 Kan. at 117. Kline also argued KRPC 8.4(c) required proof the lawyer acted with "'malevolent intent that rises above mistake.'" 298 Kan. at 119. In rejecting these arguments, the *Kline* court held:

> "[A] holistic reading of our rules contradicts Kline's suggestion that KRPC 8.4(c), (d), and (g) should be confined by a professional norm standard. As the Preamble to the KRPC notes, some rules apply to lawyers not actively practicing or to practicing lawyers not acting in a professional capacity. Similarly, lawyers can be disciplined for conduct outside the profession if the conduct 'functionally relates' to the practice of law. Holding attorneys to a professional norm standard might hinder this court's ability to punish conduct that is not prohibited by professional norms but may still impact a licensed lawyer's fitness to hold that license. [Citations omitted.]" 298 Kan. at 118-19.

The court also expressly declined "to inject such limiting language in the plain text of KRPC 8.4(c)." 298 Kan. at 119.

So what happens to *In re Kline*? And what about other decisions related to KRPC 8.4, like *In re Pyle*, 283 Kan. at 827-32? In circumstances like these, it is necessary to assess and explain the potential impact on our precedent—consequences the second majority might intend without telling us or failed to recognize without a proper stare decisis analysis. We can't know what lies ahead when the second majority remains coy about what may lurk beneath this judicial addition to our rules. Again, this is a bad way to conduct our business.

PART TWO:  EXCEPTIONS BY THE DISCIPLINARY ADMINISTRATOR'S OFFICE

A third cohort of this *Stewart* court forms yet another majority (consisting of Justices Luckert, Stegall, Wall, and Standridge) to reject the ODA's exceptions to the hearing panel's findings. 321 Kan. at __, slip op. at 28-46. Again, I part company here because the panel got it wrong by (1) finding Stewart's false weekly certifications did not violate KRPC 8.4(c), (2) failing to give the preclusive effect of the KDOL default judgment contemplated by our rules, and (3) not recognizing certain aggravating factors. These demonstrated exceptions bolster the case for finding transgressions of our rules and imposing published censure.

*Standard of review*

When a hearing panel makes factual findings, "[e]ach finding of fact must be established by clear and convincing evidence." Kansas Supreme Court Rule 226(a)(1)(A) (2025 Kan. S. Ct. R. at 275). And when this court reviews a panel's affirmative findings, it does so under a clear and convincing evidence standard. See *In re Gamble*, 319 Kan. at 695 ("Whether submitted by evidence through an adversarial system or by uncontested agreement, we review it under the same standard—ascertaining the existence of clear and

convincing evidence to support a legal conclusion."); *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020) (clear and convincing evidence is evidence causing the factfinder to believe the truth of the facts asserted is highly probable).

But a panel's negative findings should be reviewed differently, since such determinations result from a party's failure to bear the burden of proof imposed on that party. In *In re Lober*, 276 Kan. 633, 636-37, 78 P.3d 442 (2003), the court noted: "This court views the findings of fact, conclusions of law, and recommendations made by the disciplinary panel as advisory, *but gives the final hearing report the same dignity as a special verdict by a jury or the findings of a trial court.*" (Emphasis added.) In this regard, *Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, Syl. ¶ 4, 500 P.2d 39 (1972), is instructive: "Absent arbitrary and capricious disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice on the part of the trial judge, the [negative] finding cannot be disturbed."

*Stewart's false weekly certifications*

Our "third" majority concludes clear and convincing evidence does not establish Stewart violated KRPC 8.4(c) when he falsely certified "under the penalty of perjury" that he did not "'work in or receive any compensation for self-employment during the week being claimed.'" 321 Kan. at __, slip op. at 34-43. On the "work" prong, the third majority accepts the final hearing report's paragraphs 46 (finding KDOL's forms lack of definition for "work") and 51 (finding the absence of evidence showing Stewart's work was compensable). 321 Kan. at __, slip op. at 36-37. On the "compensation" prong, it likewise adopts the panel's findings that while his one-lawyer firm received $124,881 during the relevant period, that compensation went to the firm, not to him personally (e.g., ¶¶ 52, 105-07), and that the KDOL form lacked a definition of "'income'" (e.g., ¶¶ 137, 138). 321 Kan. at __, slip op. at 40-43. To be clear, I'm on board with the third

61

majority to the extent that ample evidence supports these findings. My concern is this: Why do they matter when Stewart admits he actively worked in and *received compensation* for self-employment?

A quick review of the evidence supports Stewart's admission, but the panel determined otherwise because it misinterpreted the form's plain language. The questionnaire simply asked: "Did you work in *or* receive compensation for self-employment during the week being claimed?" (Emphasis added.) Obviously, it uses "or," the conjunction that joins alternatives, to treat working in and receiving compensation for self-employment as independent triggers requiring disclosure. It directs a claimant to report any self-employment activity, regardless of payment, and any compensation, regardless of personal income. This disclosure was not limited to compensated work or attorney's income, contrary to a narrower interpretation preferred by my colleagues.

Stewart received "compensation for self-employment," i.e., any "[r]emuneration and other benefits received in return for services rendered," when his firm collected $124,881 in fees for services he provided to his client. See Black's Law Dictionary 356 (12th ed. 2024) (defining "compensation"). Stewart even concedes drawing on those funds for his own use. And he "acknowledged that he behaved dishonestly" in certifying these forms, explaining he did so out of concern that his law firm would not survive the pandemic and continued applying for Pandemic Unemployment Assistance benefits to create a "'financial safety net.'"

This undisputed evidence begs the question: Is it reasonable to find Stewart did not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation when he certified he did not "work in or receive any compensation for self-employment"? See *Short*, 210 Kan. 68, Syl. ¶ 4; Merriam-Webster Online Dictionary (defining "arbitrary" as "existing . . . as a capricious and unreasonable act of will"). Put differently, do the panel's

affirmative findings support its legal conclusion that Stewart did not violate KRPC 8.4(c)? I answer no, and my response remains the same even if I accept the panel's factual findings relevant to Stewart's weekly claims.

None of the panel's factual determinations justify or excuse Stewart's admitted misconduct under KRPC 8.4(c). By certifying he did not work in or receive compensation for self-employment, Stewart made a materially false assertion—conduct that plainly constitutes "dishonesty, fraud, deceit or misrepresentation" under KRPC 8.4(c). See Black's Law Dictionary 1195 (12th ed. 2024) (defining "misrepresentation" as "[t]he act or an instance of making a materially false or misleading assertion about something, usu[ally] with the intent to deceive"). This is underscored by Stewart's response to one of the form's other questions. When asked to "[c]hoose the reason [he was] unemployed as a result of COVID-19," he deliberately selected 23 times the admittedly false option: "My place of employment is closed as a direct result of COVID-19." And he did that despite the availability of an alternative option that more accurately reflected his situation: "I am self-employed . . . and experienced a significant reduction of services because of the COVID-19 public health emergency." To me, this is telling.

A reasonable lawyer's reading would consider the latter option more fitting given his self-employed status, indicating his repeated selection of the former choice was, at best, materially misleading. See KRPC 8.4(c) ("*It is professional misconduct for a lawyer* to engage in conduct involving dishonesty, fraud, deceit or *misrepresentation*." [Emphases added.]); Black's Law Dictionary 1195. Moreover, Stewart testified he did not recall selecting the former option and clarified "his place of employment could not have closed because he operated his office out of his house." This shows his repeated certifications were not given "truthfully."

I would hold his false certifications go beyond something that is merely facially frivolous because they demonstrate "'actual harm to the legal profession.'" See *In re Busch*, 287 Kan. 80, 87, 194 P.3d 12 (2008). They reflect much more than a singular low-risk, inadvertent mistake. They constitute a series of errors that cumulatively amount to negligent misrepresentation at a minimum with considerable leaning towards fraud with a purpose to secure public funding during a national emergency. This most certainly undermines the integrity of Kansas lawyers.

To be sure, determining a person's intent is challenging. We can never truly know what someone is thinking, requiring us to best judge it based on the evidence available—their actions. Perhaps most apt is Justice Stewart's famous quote on identifying obscenity—"I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it . . . ." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964) (Stewart, J., concurring). Even so, this inquiry is not outside our wheelhouse.

The totality of circumstances—i.e., the certifications made under penalty of perjury, the continued receipt of benefits while actively working and being paid, and Stewart's own admissions—support a plain-as-your-face finding that his conduct was not merely negligent but shaded toward knowing misrepresentation, if not outright deceit. Not finding an affirmative fact of knowing misrepresentation under this evidence is capricious. See *Short*, 210 Kan. 68, Syl. ¶ 4 ("Absent arbitrary and capricious disregard of undisputed evidence . . . , the [negative] finding cannot be disturbed.").

*The default order's preclusive effect*

As to the ODA's exception to the panel's refusal to accept the Kansas Department of Labor appeals referee's default order, our third majority upholds the panel, reasoning it

64

was not bound by KDOL's default determination. 321 Kan. at __, slip op. at 44. I disagree, and so do our rules. Kansas Supreme Court Rule 220 (2025 Kan. S. Ct. R. at 268) provides:

"(a) Deferral. If *a civil action, administrative agency action, or other proceeding* is pending against a respondent based on substantially similar allegations as a disciplinary matter, the following provisions will apply:

(1) the investigation of an initial complaint or a report will not be deferred unless specifically authorized by the disciplinary administrator; and

(2) the investigation of a docketed complaint and prosecution of a formal complaint will not be deferred unless specifically authorized by the review committee, the hearing panel, or the Supreme Court.

"(b) Judgment or Ruling. Except as otherwise provided in subsection (c), a certified copy of *a judgment or ruling in any action involving substantially similar allegations as a disciplinary matter is prima facie evidence of the commission of the conduct that formed the basis of the judgment or ruling, regardless of whether the respondent is a party in the action. The respondent has the burden to disprove the findings made in the judgment or ruling*.

"(c) Judgment or Ruling Based on Clear and Convincing Evidence. For the purpose of a disciplinary board proceeding, a certified copy of a judgment or ruling described in subsection (b) that is based on clear and convincing evidence is conclusive evidence of the commission of the conduct that formed the basis of the judgment or ruling. The respondent may not present evidence that the respondent did not commit the conduct that formed the basis of the judgment or ruling." (Emphases added.)

Here, KDOL's default order qualifies under subsection (b). It applies to "any action," clearly referring to the same "civil action, administrative agency action, or other proceeding" described in subsection (a). The ruling issued by the KDOL appeal referee,

65

an administrative adjudicator acting within an agency proceeding, addressed allegations identical, not just "substantially similar," to those raised in the present proceeding. See K.S.A. 2024 Supp. 44-709(d). And Rule 220(b) makes clear such an order constitutes "prima facie evidence of the commission of the conduct that formed the basis of the judgment," carrying substantial weight in our disciplinary process.

While the panel dismissed the default order on the ground it did not contain any affirmative findings, there is no basis for doing so in the rule. It does not even require the respondent to be a party in the action, underscoring its broad application and the legal effect such rulings carry when deciding disciplinary matters. Subsection (c) reinforces this conclusion because it heightens the consequences for judgments established by clear and convincing evidence to prohibit a lawyer in a disciplinary matter from presenting any contrary evidence.

I would agree with the ODA. Although the default order may not serve as conclusive proof, it creates a rebuttable presumption that shifts the burden to Stewart to disprove the referee's finding of fraud. And since Stewart did not attempt to rebut this presumption, the panel erred by failing to accord the default order the evidentiary weight required by Rule 220(b).

*Aggravating factors*

Our third majority also adopts the final hearing report's paragraphs 121 (dishonest or selfish motive) and 122 (pattern of misconduct). Although this maintains internal consistency, my colleagues overlook that "some evidence" clearly shows these aggravating factors exist, which is all that is required. See *In re Ayesh*, 313 Kan. 441, 466, 485 P.3d 1155 (2021) ("'Unlike the standard for proving attorney misconduct, the panel does not need clear and convincing evidence to consider aggravating and mitigating

66

factors.' Nonetheless, 'some evidence of those circumstances still must be presented for weighing.' [Citations omitted.]"); *Short*, 210 Kan. 68, Syl. ¶ 4 (standard of review for negative findings).

As to paragraph 121, I find Stewart's selfish motive in dishonestly applying for PUA assistance in an attempt to "establish a 'financial safety net.'" See Merriam-Webster Online Dictionary (defining "selfish" as seeking "one's own advantage"). His conduct remains selfish, even if he acted for the benefit of his law firm or family, because his motive was centered on securing personal or closely affiliated financial gain through misrepresentation, rather than acting out of altruism or public interest.

The third majority rationalizes Stewart's culpability by characterizing his actions as the product of "confusion, carelessness, and mistakes, . . . compounded by his daily drinking." 321 Kan. at __, slip op. at 44. Certainly, Stewart's admitted alcoholism may be considered a mitigating factor in this context, but that does not diminish his culpability as an independent aggravating factor. The presence of mitigation here does not erase aggravation; both can coexist and must be assessed on their own terms. And given Stewart's stipulated admission of dishonesty and selfish motive, the panel's failure to find this aggravating factor is arbitrary and capricious, particularly when an applicable standard of proof is merely "some evidence."

Finally, the panel's failure to find a pattern of misconduct is arbitrary and capricious as a matter of law, given the evidentiary weight, because the panel erroneously applied a higher standard of proof (clear and convincing evidence) rather than the correct "some evidence" standard. For example, Stewart repeatedly selected an entirely inapplicable option: "My place of employment is closed as a direct result of COVID-19." He made this choice 23 times. But by his own admission, this could not be true because he was self-employed and worked from home. Consequently, the panel erred in finding otherwise.

PART THREE:  THE RORSCHACH TEST OF ATTORNEY DISCIPLINE

Recognizing my remaining comments extend the discourse surrounding this court's adjudication even further, I nevertheless feel compelled to offer my own views that sharply diverge from those of two of my colleagues. See 321 Kan. at __, slip op. at 49-82 (Stegall, J., concurring in part and dissenting in part, joined by Wall, J.). To me, their observations resemble interpretations of ambiguous inkblots in a Rorschach test, prone to subjectivity and personal bias. And to that extent, I concede mine are likely subject to the same infirmities, but I simply don't see what they do.

Over the decades since becoming a licensed bar member, I have (1) participated in disciplinary proceedings as an at-large panel member that recommended disbarment for a young lawyer, (2) represented a disbarred attorney who showed his rehabilitation and was reinstated to practice law with dignity for the remainder of his life, (3) reported a concern that resulted in an attorney's disbarment, (4) reported a concern that was dismissed during the initial screening process, (5) testified as a witness in a reinstatement hearing, (6) responded to a complaint against me, which was screened out by the Disciplinary Administrator, and (7) served as a member of this court on more than 225 attorney disciplinary proceedings. I am well-acquainted with the system and, like any of us, have my own understanding of how it operates. I think it works well.

My experiences have shown attorney discipline is far more complex and nuanced than it might appear because it is deeply shaped by human behavior and circumstances. See, e.g., Badgerow, *Apocalypse at Law: The Four Horsemen of the Modern Bar: Drugs, Alcohol, Gambling, and Depression*, 77 J.K.B.A. 19 (Feb. 2008) ("There are many reasons for the type of conduct that leads to complaints by clients, opposing parties and counsel, and even judges, but to generalize about the causes is to invite criticism. Each case is as individual as the lawyer-respondent and the circumstances confronting him at

the time.") (reprinted with permission from 18 No. 3 Prof. Law. 2 [2007]). The stakes are high—not only because human beings are involved, but because our profession plays a vital role in the function of society's resolution of disputes and the protection of individual rights. Stewart's case is no exception.

Against this backdrop, I disagree with my two colleagues that alcohol "had next to nothing to do with the facts of this case." See 321 Kan. at __, slip op. at 95. Stewart said it did, and I believe him. He appeared before our court to describe himself as a "man who has admitted his wrongs and a man who's sober." When declaring alcohol "reigned and ruled [his] life," he referred to the income statements on the KDOL forms underlying this disciplinary complaint and conceded, "I guess I didn't care at the time." From what I observed, I saw an attorney rejoicing in his sobriety with the support of family, friends, and fellow attorneys, while acknowledging the disciplinary complaint against him was "necessary, was self-induced and self-inflicted," and stating, "[T]he discipline of censure is appropriate."

Similarly, I do not share my two colleagues' apparent concern that the adversarial process in disciplinary cases is being undermined "in favor of a mitigation only approach that treats every ethics case like a social problem." See 321 Kan. at __, slip op. at 95. Kansas lawyers representing respondents know how to advocate for their clients. Of course, some are more skilled than others, but all legal representation involves assessing risks and ultimately following the client's direction in what best serves that client's interests. And I have never seen a case result in discipline that had no basis for it—even when the parties or some members of the presiding panel or the court disagreed on the merits or the appropriate sanctions. Said differently, innocent lawyers are not being led to slaughter, and I know of no reason to believe serious misconduct escapes notice when it surfaces.

What's more, my two colleagues repeatedly imply Stewart was poorly represented in this matter. They assert: His counsel "left almost no room for Stewart to defend himself"; his counsel's "handling of this case" likely left "substantive defenses on the cutting room floor and undermine[d] the adversarial process that we rely on"; his counsel did not demonstrate he "endeavored to fully understand the way the highly complex Pandemic Unemployment Assistance Program was intended to work"; and "a review of this record shows clearly that Stewart was faced with counsel *on both sides* who advocated for his guilt." (Emphasis added.) 321 Kan. at ___, slip op. at 83, 92, 94. Again, I do not share their portrayal.

If nothing else, this court's fractured decision unequivocally illustrates the perils facing Stewart's counsel in evaluating client risk. This court is all over the place in its analysis. More importantly, we do not know what occurred between attorney and client, nor are we aware of the outcome of counsel's work product. Stewart and his attorney exhibited a unified front to advocate for a particular disposition, which is how it is supposed to be. Reinforcing this, my assessment of Stewart's appearance before our court was one of a man who was not being led astray, not forced to say anything he did not believe, and sincere when he said, "I'm not a victim here." He was not someone being thrown under a bus or forced to "'fall on his sword.'" 321 Kan. at ___, slip op. at 92.

Finally, Justices Stegall and Wall's portrayal of my reasoning illustrates all too well my earlier point about the Rorschach test of attorney discipline. 321 Kan. at ___, slip op. at ___. Readers can judge for themselves just how accurate or distorted their descriptions are. But I think such characterizations show that when it comes to attorney discipline, some only see what they already believe.

To sum up, I believe my two colleagues' stated hope of bringing a "high degree of clarity" to this case and the disciplinary process, with their "fat tails" and "thin tails" analogies, does not achieve that end. See 321 Kan. at ___, slip op. at 70, 97-103. Such

70

efforts would be better directed toward doing the work of proposing revisions to our rules that address their concerns. Those proposals could then be vetted through the established judicial rulemaking process with the necessary input from members of the bar and the public. That is how we better achieve clarity.

STANDRIDGE, J., joins Part One of the foregoing concurring and dissenting opinion.

ROSEN, C. J., joins Parts Two and Three of the foregoing concurring and dissenting opinion.

\* \* \*

STEGALL, J., concurring in part and dissenting in part: Shawn Stewart's disciplinary case has fractured this court in complex ways that reveal deep underlying disagreements about the attorney discipline process as it currently operates in Kansas. As such, it is significant beyond a mere resolution of the matter of Stewart's alleged ethical lapse and any appropriate sanction. A high degree of clarity is required to explain precisely what the court holds today, and to flesh out the rationale for the various schools of thought existing on the court. This separate opinion takes on that task—in four parts.

First, we will explain how we concur with the legal holding of the lead opinion. Second, this opinion describes how we disagree with the ultimate conclusion reached by the per curiam opinion that Stewart violated Kansas Rules of Professional Conduct (KRPC) 8.4(c) (2025 Kan. S. Ct. R. at 426). In our view, the complicated facts, when fully understood, make it clear that the only misrepresentation found by the panel does not adversely reflect on Stewart's fitness to practice law. Third, we will tackle the difficult and elusive subject of the "culture" of the attorney disciplinary process in Kansas with the aim of showing that this case is emblematic of the negative impact of that culture

71

on clear and consistent adjudication of these cases. And finally, we will offer an insight gleaned from public choice theory as a helpful and necessary framework to guide reform of the attorney disciplinary process in Kansas.

DISCUSSION

*What KRPC 8.4(c) means*

Let's begin with where we concur. We agree and expressly join that portion of the per curiam opinion that states that when the ODA charges a "misrepresentation" as a violation of KRPC 8.4(c), "the ODA must prove by clear and convincing evidence both that the alleged misrepresentation was made and that the misrepresentation adversely reflects on the lawyer's fitness to practice law." *In re Stewart*, 321 Kan. at ___, slip op. at 2. Practically speaking, this is the most important holding to come out of Stewart's case, as well as being the point of greatest agreement on the court. See 321 Kan. at ___, slip op. at 49 (Luckert, J., concurring); 321 Kan. at ___, slip op. at 50 (Rosen, C.J., concurring in part and dissenting in part). Likewise, we concur with the lead opinion's rejection of the exceptions to the hearing panel report taken by the ODA. Finally, we agree with Justice Luckert that KRPC 8.4(c) is ambiguous. 321 Kan. at ___, slip op. at 49 (Luckert, J., concurring). But we find the per curiam opinion and the concurring opinions on this point to be lacking in explaining precisely how that ambiguity is to be resolved. We take the opportunity here to offer our rationale.

We begin, as always, with the plain language of the rule itself. KRPC 8.4(c) states: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." (2025 Kan. S. Ct. R. at 426). On its face, the plain text prohibits *any and all* misrepresentations by a lawyer either within or without the practice of law. See Supreme Court Rule 203(a) (2025 Kan. S. Ct. R. at 247) ("An attorney is required to act at all times, both professionally and personally, in conformity

72

with the standards established by the Kansas Rules of Professional Conduct, the Rules Relating to Discipline of Attorneys, and the attorney's oath of office."); Supreme Court Rule 203(b) (2025 Kan. S. Ct. R. at 247) ("Misconduct is a ground for discipline, regardless of whether the act or omission occurred in the course of an attorney-client relationship."); *In re Mintz*, 298 Kan. 897, 907, 317 P.3d 756 (2014) ("In many cases, we have recognized that violations of the KRPC can occur for dishonest conduct outside the practice of law."); *In re Kline*, 298 Kan. 96, 119, 311 P.3d 321 (2013) ("[L]awyers can be disciplined for conduct outside the profession if the conduct 'functionally relates' to the practice of law.").

And yet we have in the past found that certain misrepresentations do not violate KRPC 8.4(c). *In re Morton*, 317 Kan. 724, 748, 538 P.3d 1073 (2023) (misrepresentation that was "either immaterial or [at most] negligent" was not a rule violation under KRPC 8.4[c]); *In re Pyle*, 283 Kan. 807, 827, 156 P.3d 1231 (2007) (no KRPC 8.4[c] violation when incorrect statement reflected "mistake rather than malevolence"). In fact, a complete review of our precedent on KRPC 8.4(c) demonstrates that we have never thoroughly analyzed the meaning of the word "misrepresentation" in the code. Further, our precedent shows a case-by-case approach that could *appear* inconsistent when it is unsupported by a precise legal analysis of the black letter meaning of the rule itself.

The per curiam opinion relies on *In re Sutton* to hold that a negligent misrepresentation may be a violation of KRPC 8.4(c). *In re Stewart*, 321 Kan. at ___, slip op. at 27. There, the panel found that the respondent had negligently given inaccurate information to two school principals that no court order regarding school attendance was in effect when, in fact, an order was in effect. The panel in *Sutton* also found that the respondent had engaged in dishonest conduct. To avoid the "questionable result" of "negligent dishonesty," we noted that misconduct under KRPC 8.4(c) can be merely negligent and held that regardless, published censure was the appropriate reprimand for conduct that involved either dishonesty or negligence. 306 Kan. 503, 506-07, 510-11, 394

73

P.3d 836 (2017) ("misrepresentation—a form of misconduct that is also covered by KRPC 8.4[c]—can be merely negligent"). But our caselaw is not so simple. In *Morton*, we held that an attorney's inadvertent publication of an unfinished website featuring other firms' branding as a template was not a violation of KRPC 8.4(c). In that case, we were confident that the attorney's actions were immaterial, mistakes, and (at most) negligent. 317 Kan. at 748-49.

Given this lack of clarity on an important provision of the code, we should perform the necessary legal analysis to arrive at a binding legal meaning of the term "misrepresentation" in KRPC 8.4(c). Legal interpretation of the rules is a question of law over which we exercise plenary review. See *In re Bryan*, 275 Kan. 202, 211, 61 P.3d 641 (2003) ("Interpretation of the Kansas Rules of Professional Conduct is a question of law over which this court has unlimited review."). Our method of statutory interpretation is well settled and applies equally to the interpretation of other written codes such as the Rules of Professional Conduct. See generally *Office of Discip. Co. v. Anonymous Atty.*, 327 A.3d 192, 201 (Pa. 2024) ("When interpreting statutory language, we do so 'not in isolation, but with reference to the context in which it appears[,]' and we extend the same rationale to interpreting our own rules."); *Cohen v. Statewide Grievance Committee*, 339 Conn. 503, 521, 261 A.3d 722 (2021) ("[W]hen we are required to interpret the Rules of Professional Conduct, our review is plenary, and the rules of statutory interpretation apply."); *In re Disciplinary Action Against Feland*, 820 N.W.2d 672, 680 (N.D. 2012) ("When we interpret a rule, we apply the established rules of statutory construction and look to the language of the rule to determine its meaning.").

If the text of a rule is plain and unambiguous, we will not look beyond the plain meaning or alter it. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022) (appellate court should not speculate about the legislative intent behind clear language and should refrain from reading something into the [rule] that is not readily found in its words). Where an ambiguity exists, however, we must apply our canons of construction to

74

resolve that ambiguity. *State v. Betts*, 316 Kan. 191, 198, 514 P.3d 341 (2022) (if language or text is unclear or ambiguous the court uses canons of construction or legislative history to construe the Legislature's intent). An ambiguity exists when the text of a rule is reasonably subject to multiple interpretations. *Glaze v. J.K. Williams*, 309 Kan. 562, 564, 439 P.3d 920 (2019) (quoting *Petty v. City of El Dorado*, 270 Kan. 847, 851, 19 P.3d 167 [2001]) ("'A statute is ambiguous when two or more interpretations can fairly be made.'"). To ascertain the true meaning, we must look beyond the text. In so doing, a reviewing court may consider legislative history, the full import of the code as a whole, the purpose of the rule, and the effect various interpretations may have on the legal profession. *State v. Strong*, 317 Kan. 197, 203, 527 P.3d 548 (2023) (appellate courts should consider various provisions of an act *in pari materia*); *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1123, 307 P.3d 1255 (2013) ("[I]f . . . language is subject to multiple interpretations, a reviewing court '"may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the [rule] may have under the various constructions suggested." [Citation omitted.]'"); *In re Wrongful Conviction of Warsame*, 320 Kan. 92, 96, 563 P.3d 1281 (2025) ("The plain text does not say, so the court must resort to tools of construction, including an examination of legislative history."). Moreover, we construe the rules to avoid absurd results and presume the drafters did not intend to enact useless or meaningless provisions. *State v. Smith*, 311 Kan. 109, 114, 456 P.3d 1004 (2020).

The term "misrepresentation" found in KRPC 8.4(c) is at the core of this disciplinary case. Black's Law Dictionary defines "misrepresentation" as "[t]he act or an instance of making a materially false or misleading assertion about something, usu[ally] with the intent to deceive." Black's Law Dictionary 1195 (12th ed. 2024). See also Webster's New World College Dictionary 935 (5th ed. 2016) (defining "misrepresent" as, "to represent falsely; give an untrue or misleading idea of"). Though misrepresentation may be a common enough word, its ordinary dictionary definition is inadequate to tell us with precision exactly the kinds of statements the drafters intended to prohibit under

75

KRPC 8.4(c). For example, Black's Law Dictionary suggests that most of the time, a misrepresentation requires an "intent to deceive," but not always. How are practitioners or those charged with enforcing the code to know where that line is? There is nothing in the plain text or definition of the word itself that guides this all-important inquiry. Indeed, we know from our caselaw discussed above that "not all misrepresentations" are "created equal." See *In re Knopp*, 305 Kan. 493, 518, 384 P.3d 428 (2016) ("The court appreciates respondent's counsel's point that not all misrepresentations to courts are created equal. Some turn out to be more consequential than others.").

Everyday life is full of such examples of the inconsequential—and often comic—foibles of human misrepresentations. What of the lawyer who "puffs" about his or her prowess in some athletic endeavor? See Shakespeare, Henry IV, Part 1, Act 2, scene 4 (Falstaff regaling the tavern crowd with a story of him fighting off a large and ever-changing number of attackers on the road to Gad's Hill, while Prince Hal and Poins, the only two attackers, listen on). The rules of professional conduct surely do not prohibit the occasional "foot niblick"—a technique employed by amateur golfers to improve a ball's lie with their feet and referred to by one author as the "[b]est club in the bag to speed up play." Pedroli & Tiegreen, Let the Big Dog Eat!:  A Dictionary of the Secret Language of Golf 39 (2000). Even honorable members of the bench are known for occasional "misrepresentations" on the links. See Caddyshack (Orion Pictures 1980) (humorous portrayal of Judge Smails employing the foot wedge—"Why don't you improve your lie? Yes, yes. Winter rules.").

If indeed the code condemned *every* misrepresentation, even more serious matters such as shielding children from generational trauma through "white lies" could subject an attorney to discipline. See Star Wars:  Episode VI—Return of the Jedi (Lucasfilm Ltd. 1983) (Obi-Wan explains to Luke that Darth Vader *did* betray and kill his father "from a certain point of view."). These are silly cultural and literary references, to be sure, but the silliness is the point. The code is not intended to punish lawyers regaling their friends

76

with tall tales about "the one that got away." Stone, The One that Got Away 11 (1947) ("You know what they say about fishermen? The only time they tell the truth is when they call other fishermen liars."). This lack of clear guidance in the plain text itself is a hallmark of ambiguity.

Justice Biles dismisses our concern by testifying to his confidence in our disciplinary process and its "gatekeeping function" to "screen[] out" a lawyer's "minor mistakes" that have "no bearing on the legal profession." See 321 Kan. at ___, slip op. at 56 (Biles, J., concurring in part and dissenting in part). This response is troubling on many levels. First, it is not obvious why it is a good thing for a gatekeeper to "screen out" *actual* violations of the law. Indeed, on what basis would such a gatekeeper make those decisions? If every single misrepresentation is in fact a violation of our rules, as Justice Biles suggests, why would we want to countenance an enforcement arm that simply ignores most violators? Second, Justice Biles' "trust the prosecutor" approach amounts to an abdication of the judicial role. In what other context would we simply trust the prosecutor with unfettered discretion to decide who to charge and who not to charge? We do not permit that approach in the criminal law context nor should we permit that here. See *State v. Harris*, 311 Kan. 816, 823, 467 P.3d 504 (2020) ("If a law 'makes everyone' a violator, then 'prosecutors and the police [will] both define the law on the street and decide who has violated it.'").

> "[T]he day-to-day decisions of prosecutors fill in the blanks left by the legislature when it crafts necessarily broad and general criminal statutes. This 'prosecutorial discretion' is an immensely powerful tool . . . . [T]he Kansas Supreme Court ha[s] limit[ed] the level of discretion the legislature may give to prosecutors. The basic principle is clear: when crafting a statute, the legislature must not delegate the ability to decide what the law says on an *ad hoc* basis to the executive or judicial branches. Laws that delegate too much discretionary authority to non-legislative actors to define criminal conduct are necessarily void for vagueness. A vague law 'invite[s] arbitrary power' and 'threaten[s] to transfer

legislative power to police and prosecutors, leaving them the job of shaping a vague statute's contours through . . . enforcement decisions.'" Stegall, *Something There Is that Doesn't Love a Wall*, 46 Harv. J.L. & Pub. Pol'y 361, 371-72 (2023).

Why would we accept this kind of glaring flaw in our attorney disciplinary system that we reject elsewhere? And even when a disciplinary case does not ultimately result in unwarranted sanction, the process itself can harm a respondent. *In re Valdez*, 321 Kan. 198, 213, 574 P.3d 835 (2025) (Stegall, J., concurring) ("Now, years later, after countless news stories, public outcry, lawyers hired, weeks and months of investigations and hearings, and a subsequent election for Douglas County District Attorney at which the respondent was unseated in part because of these charges—here we are. Was it worth it? No, it was not.").

Therefore, because the meaning of misrepresentation as used in KRPC 8.4(c) is ambiguous, we turn to our canons of construction to determine what types of misrepresentation are prohibited by our ethics rules. We begin with the very last substantive rule in our code, KRPC 8.4(g):  it is misconduct for a lawyer to "engage in any *other* conduct that adversely reflects on the lawyer's fitness to practice law." (Emphasis added.) (2025 Kan. S. Ct. R. at 426). The use of the word "other" clearly indicates that the modifier in KRPC 8.4(g) applies equally to all the subsections in KRPC 8.4 itself. That is, each subsection is designed specifically to prohibit conduct "that adversely reflects on the lawyer's fitness to practice law." It is not a stretch to say that KRPC 8.4(g)—especially coming as it does at the very end as a "catch-all" provision— modifies and clarifies the fundamental purpose of the *entire code of conduct*.

A wise man explaining the animating principle of all law once observed that "[o]n these hang all the law and the prophets." Matthew 22:40 (King James). With respect to the rules of attorney discipline, the same could be said of KRPC 8.4(g). All the rules hang on the principle that the conduct proscribed is *anything* that adversely reflects on an

attorney's fitness to practice law. The whole rest of the code is, in a sense, a footnote to KRPC 8.4(g). A very important footnote, to be sure, as the code expounds and explains in great detail all the ways an attorney might demonstrate unfitness to practice law. This is good and necessary as it provides concrete and specific binding guidance to both attorneys in practice and those charged with enforcing the code—as well as providing full notice and due process protections. But we must never lose sight of the animating principle of the code, which is both simple and profound. The license to practice law is a public trust, and an attorney's fitness to hold that trust is the singular and overriding concern of the code. Indeed, it is impossible to imagine a rule violation for conduct that does *not* adversely reflect on an attorney's fitness to practice law.

We find further support for this notion elsewhere in the code. In the preamble, structure, and comments to our code of professional conduct, the drafters provide helpful insight. For example, the drafters explicitly clarify the scope of the rules by stating that "[t]he Rules of Professional Conduct . . . should be interpreted *with reference to the purposes of legal representation* and of the law itself." (Emphasis added.) KRPC Scope [14] (2025 Kan. S. Ct. R. at 315). Recognizing the impossibility of regulating every instance of human behavior, the code states: "The Rules simply provide a framework for the ethical practice of law." KRPC Scope [16] (2025 Kan. S. Ct. R. at 315). Turning to the rules in KRPC 8.1-8.5, the title of that section is instructive: "Maintaining the Integrity *of the Profession*." (Emphasis added.) (2025 Kan. S. Ct. R. at 423). The first line of KRPC 8.4 is as telling: "It is *professional misconduct* for a lawyer to . . . ." (Emphasis added.) (2025 Kan. S. Ct. R. at 426). And lastly, the comments to KRPC 8.4(b) establish that when considering criminal matters, the code is fixated on holding attorneys "professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice." KRPC 8.4, comment [2] (2025 Kan. S. Ct. R. at 426) ("Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offense carry no such implication. Traditionally, the distinction was drawn

in terms of offenses involving 'moral turpitude.' That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. *Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice.* Offenses involving violence, dishonesty, or breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." [Emphasis added.]).

Hence, we arrive at the definitive interpretation of KRPC 8.4(c) which mandates that before a violation may be proven, two elements must be met: (1) the existence of a misrepresentation; and (2) that the misrepresentation adversely reflects on the lawyer's fitness to practice law.

*Stewart's misrepresentation does not adversely reflect on his fitness*

Having gotten this far, we are left to ask—generally, how will a court know when a misrepresentation adversely reflects on a lawyer's fitness; and specifically, does Stewart's misrepresentation adversely reflect on his fitness to practice law? It is here that we depart from the per curiam opinion and the other concurring opinions.

Neither the per curiam opinion nor the separate concurring opinions ventures an answer to the crucial first question. They merely jump to the declaration that Stewart's misrepresentation does adversely reflect on his fitness. At first blush, this conclusion seems reasonable enough. After all, Stewart was filling out a government form applying for taxpayer funded benefits. As a lawyer, "he should have been more careful" is the basic rationale. But the other opinions offer no legal framework for reaching the decision. A careful review of the facts, meanwhile, puts the following conclusion beyond

question—Stewart's misrepresentation cannot have adversely reflected on his fitness to practice law because Stewart's declared 2019 net income (entered on his Pandemic Unemployment Assistance [PUA] application in May of 2020), only *became* inaccurate long after it was made as a function of his 2019 tax return filed in October of 2020. Moreover, a review of the PUA program itself conclusively demonstrates that Stewart's inaccurate estimate of his 2019 net income was utterly irrelevant as a matter of law to the benefits he was entitled to under the PUA program. On these facts, as shown in great detail below, Stewart's error was at most a mere mistake that should have been irrelevant to his benefit calculation by the state agency in charge of administering the program.

But before doing a deep dive into the facts, we answer the general question—what legal framework should a court use to determine when a misrepresentation adversely reflects on a lawyer's fitness to practice law? At the outset, it is important to observe that "fitness" is a broad category encompassing far more than a lawyer's ability to write a contract or try a case. As we have already said, the license to practice law is a public trust. A lawyer's character and integrity are paramount to the maintenance of that trust. A lawyer's character for telling the truth in all the many circumstances where the truth goes hand-in-glove with maintaining professional trust—and his or her reputation for doing so—is perhaps his or her greatest single asset in the practice of law. Nothing in this extensive discussion should be read to suggest otherwise, or to undermine this critical function of attorneys in our democratic society.

And yet we know from ordinary human experience that certain modes of speech are governed by a markedly relaxed standard. Because these kinds of unique facts and fine distinctions are often present in disciplinary cases, they are traditionally evaluated on a case-by-case basis. So too here, any "bright line" rule we might devise would be inappropriate. *In re Spradling*, 315 Kan. 552, 592, 509 P.3d 483 (2022) ("'We prefer to examine the particular circumstances of each disciplinary case'" and declining to "dictate any bright line rule for defining when an attorney has violated [the] KRPC.") (quoting *In*

81

*re Ketter*, 268 Kan. 146, 153, 992 P.2d 205 [1999]). This principle runs throughout our disciplinary process from establishing rule violations, to our evaluation of aggravating and mitigating factors, to our decision on the appropriate sanctions, if applicable. See *In re Geeding*, 270 Kan. 139, 147, 12 P.3d 396 (2000) (rejecting a bright-line rule when considering aggravating and mitigating factors, opting instead to consider the facts on a case-by-case basis); *In re Daniels*, 320 Kan. 365, 381, 568 P.3d 846 (2025) (acknowledging that "'[b]ecause each case is unique, past sanctions provide little guidance'") (quoting *In re Bishop*, 285 Kan. 1097, 1108, 179 P.3d 1096 [2008]).

Consistent with our entire approach to the code, we would answer the question in each case with a complete digestion of the totality of the circumstances. To guide that process, we discern the following factors as relevant: (1) the respondent's state of mind; (2) the injury done, if any; (3) the seriousness of the matter; (4) the relationship between the affected parties; (5) the respondent's conduct following the misrepresentation; (6) the presence or absence of a selfish motive; and (7) any other factors a factfinder would deem relevant when considering whether the respondent's actions adversely impacted their fitness to practice law.

In examining our suggested factors, state of mind is quite obviously relevant. Where a negligent misrepresentation occurs during the practice of law, for example, that misrepresentation may indicate such a lack of care for truth-telling that an attorney's competence under the rules is legitimately called into question. Mere mistakes of the everyday variety—a math error for example—may not. Intentional misrepresentations when combined with other factors we have identified—such as a selfish motive or a matter of significant importance—clearly do give rise to a presumption that the lawyer may be unfit to practice law.

Misrepresentations that cause real injury and harm to another person are more damaging to the public trust than ones which do not. Similarly, the relationship between

the parties matters. Is there a reliance interest such that a misrepresentation places one party at a disadvantage? Was the misrepresentation made to take advantage of a power imbalance between the parties?

Likewise, the substance of the misrepresentation is a key component of the evaluation. Matters of importance relating to the practical purpose and function of the rule of law—financial dealings, dispensing justice, preserving rights, establishing social status and standing, and the like—are all guarded by a rigorous attention and care for the truth. These are to be distinguished from trivial and expected everyday patterns of speech—including social norms of communication, humor and sarcasm, exaggeration, puffing, metaphor, and other modes of human interplay that do not rely on a denuded and hyper-literal interpretive process.

The final two factors also work in tandem. Where a lawyer makes a misrepresentation out of a selfish motive or for some ill-gotten private gain, we may again presume a breach of the public trust. Where a lawyer acts expeditiously to correct a misrepresentation if and when he or she becomes aware that it has injured another, we may view it as a species of mistake or misunderstanding common to human experience.

Now, applying this all to the current matter. Stewart has admitted to making a "misrepresentation." The hearing panel found Stewart applied to the PUA program in May 2020. The application form required the respondent to identify his quarterly 2019 net income. He stated that he made $30,000 each quarter, for an annual total of $120,000. At the time of this application, he could not reference his 2019 tax return because it was not filed until October 2020. The 2019 tax returns indicate his "gross profit" was $145,000 while—after claiming significant deductions including for the use of a personal vehicle and personal home office—his "net profit" for that year was $36,722. The hearing panel concluded this was a negligent misrepresentation.

Critically, the panel found that "'there was no evidence the respondent knew what his actual net loss or profit from the Law Firm was when he filled out the PUA application.'" *In re Stewart*, 321 Kan. at ___, slip op. at 17. Indeed, because Stewart's law firm was taxed as a pass-through entity, it is a complete non sequitur to speak of "actual net loss or profit" *prior* to the completion of the taxpayer's schedule C on his or her tax return. Schedule C offers the taxpayer significant leeway to claim or not claim a whole variety of deductions to gross income for business expenses. Stewart's gross income actually exceeded his net income estimate in May of 2020 on the PUA application. His taxable income (which the PUA program equates with net income for self-employed persons), in reality did not exist as a discrete number until his tax return was filed. This is because that figure depends entirely on the voluntary claiming of deductions by the taxpayer, something which had not yet occurred when Stewart applied to the PUA program.

Even more importantly, the record before us does not indicate that any of the parties endeavored to fully understand the way the highly complex Pandemic Unemployment Assistance program was intended to work. The law was passed as an emergency response to the COVID-19 pandemic and implemented in record speed. This necessity left in its wake a slew of confused state officials faced with carrying out a congressional mandate with little time to digest its minutia and inner-workings. And applicants for benefits were often just as confused, as the panel and lead opinion recognize. 321 Kan. at ___, slip op. at 31.

All parties below appear to have simply assumed that because respondent's 2019 tax return—once it was filed—showed a significant discrepancy with his stated self-employment income on his initial application under the PUA, he must have lied or misrepresented his income. It would have behooved the ODA, the panel, and Stewart's counsel to have dug a little deeper. In fact, Stewart's estimated self-employment income for 2019 of $120,000 fell well short of the gross earnings he actually reported on his tax

84

return of $145,000. Crucial to both this case and to the computation of benefits under the PUA is the mechanism of *how* one is to move from the gross earnings figure to a net taxable income figure. And this cannot be done without the completion of a schedule C on a person's tax return—yet another complex government form that contemplates all kinds of possible deductions to gross income in order to arrive at a lower taxable income. There is simply no way a self-employed person eligible for numerous tax deductions can know with any precision the reduction of gross profits to net profits—and hence to net income—without actually completing a tax return. Understanding this, the regulations implementing the PUA anticipated this situation and told state administrators of the unemployment benefit program what they should do in these circumstances.

The PUA statute says that: "the assistance authorized under subsection (b) for a week of unemployment shall be calculated in accordance with section 625.6 of title 20, Code of Federal Regulations." 15 U.S.C. § 9021(d)(2). These are the regulations governing the federal Disaster Unemployment Assistance (DUA) program, which was the already-existing program making benefits available to self-employed persons. In effect, Congress understood that it already had in place a program which made unemployment benefits available to a wider group of American workers and decided to repurpose those rules for use during the COVID-19 pandemic. Turning to those regulations, section 625.2(u) defines "[w]ages" as "remuneration for services performed for another, and, with respect to a self-employed individual, net income from services performed in self-employment." 20 C.F.R. § 625.2(u). However, "net-income," (the term used by the PUA application) is not defined in these regulations.

Next, 20 C.F.R. § 625.6(a)(2) states that: "The self-employment income to be treated as wages for purposes of computing the weekly amount under this paragraph (a) shall be the net income reported on the tax return of the individual as income from all self-employment that was dependent upon the performance of services by the individual." But section 625.6(a)(2) goes on to explain that "[i]f an individual has not filed a tax

85

return for the most recent tax year that has ended at the time of such individual's initial application for DUA, such individual shall have a weekly amount determined in accordance with paragraph (e)(3) of this section." 20 C.F.R. § 625.6(a)(2).

Turning to section 625.6(e)(3):

"For purposes of a computation of a weekly amount under paragraph (a) of this section, if an individual submits documentation to substantiate employment or self-employment in accordance with paragraph (e)(1), *but not documentation of wages earned or paid during the base period set forth in paragraph (a)(2) of this section, including those cases where the individual has not filed a tax return for the most recent tax year that has ended*, the State agency shall immediately redetermine the weekly amount of DUA payable to the individual in accordance with paragraph (b) of this section." (Emphasis added.) 20 C.F.R. § 625.6(e)(3).

Thus, we finally reach section 625.6(b):

"[I]f the individual has insufficient wages from employment or insufficient or no net income from self-employment (which includes individuals falling within paragraphs (a)(3) and (b)(3) of § 625.5) in the applicable base period to compute a weekly amount under paragraph (a) of this section, *the individual shall be determined entitled to a weekly amount equal to 50 percent of the average weekly payment of regular compensation in the State*." (Emphasis added.) 20 C.F.R. § 625.6(b).

Thus, on this record, it is clear the state failed to properly assess respondent's initial PUA application in the first place. This is because the state application never specifically asked for his 2019 tax return, which it should have done under the regulations. Because states had been operating and had some familiarity with the DUA program and regulations, it should not have come as a surprise that the applicant's prior year tax return would be required. A quick, nonexhaustive, survey of other states' online DUA applications show that tax returns are a standard item required from applicants. See

Nebraska: DUA Eligibility ("You will need a . . . complete set of your federal income tax return from the most recent completed tax year.); Florida: DUA Eligibility Requirements ("If you are self-employed, you will need proof of your self-employment: Tax Returns."); Iowa: How to Apply and Receive DUA ("You will need . . . a complete set of your federal income tax return from the most recent completed tax year."); Louisiana: Affected Parishes Eligible for DUA ("If you are self-employed, your 2023 federal income tax return and schedules can serve as proof of prior wages."); Arizona: Eligibility ("Required documentation includes a Social Security number and a copy of the most recent federal income tax form or check stubs, or documentation to support that the individuals were working or self-employed when the disaster occurred."); Maine: How to Apply for DUA ("The documents you need to provide . . . could include . . . your most recent federal income tax form . . . ."); Missouri: Unemployment Benefits Available to Victims of Severe Storms ("A copy of the most recent federal income tax forms or check stubs may also be required [self-employed individuals should also provide Schedules SE and Schedule C or Schedule F]."); New York: What information must I provide when applying for UI or DUA benefits? ("Applicants must provide proof [e.g., income tax return, bank statements] to document employment or self-employment or to document work that was to begin on or after the date of the disaster.").

Had the Kansas Department of Labor (KDOL) simply followed the regulations, it would have recalculated Stewart's benefits not according to speculative income figures, but according to a percentage of state averages. As a matter of law, it is correct and relevant to say that a PUA applicant's "net income" is a completely imaginary category of information until a tax return is filed and births it into existence. The regulations make it clear that until a tax return is filed, the applicant has no net income and benefits must be calculated on an equity-based state average figure. Indeed, under the proper state-average figure, it appears Stewart would in fact have been entitled to some benefits. This demonstrates his claim to benefits was certainly made in a good faith belief that he would receive something.

87

We do not make all these observations to castigate anyone involved. The pandemic was a difficult time for everyone, especially government officials trying in warp-speed to inject necessary support into the economic life of the nation. Rather, we take the time here to parse through these details to illustrate that this case of "misrepresentation" is not nearly as simple as everyone below seemed to think it was. And that matters. Had the state simply followed the law, this entire domino chain would never have fallen.

Having clarified what happened, we undertake a brief analysis of these unique facts through the lens of the factors we have identified.

1. *State of mind*

In examining state of mind, the ODA failed to show the respondent intentionally misrepresented his 2019 quarterly income because, at the time, he could not access his tax return indicating the actual income, and the application form itself failed to explain how a self-employed person should calculate their net income. Because of these factors, the respondent testified that his income representations were estimates. This evidence supports inferences of confusion, misunderstanding, and neglectful conduct, but does not rise to the level of proving the more culpable intentional conduct by clear and convincing evidence. See *In re Pyle*, 283 Kan. at 827 (finding a "mistake rather than malevolence" was not a violation of KRPC 8.4[c]).

Such actions rooted in confusion differ from the types of misrepresentations we have sanctioned in the past. See *In re McVey*, 317 Kan. 266, 275, 280, 527 P.3d 900 (2023) (finding KRPC 8.4[c] violation for intentionally converting escrow funds and when client had to go to great lengths to recover assets); *In re Christian*, 281 Kan. 1203, 135 P.3d 1062 (2006) (attorney engaged in dishonesty in violation of KRPC 8.4[c] by

knowingly and repeatedly converting attorney fees belonging to the firm for his own use); *In re Islas*, 279 Kan. 930, 112 P.3d 210 (2005) (attorney violated KRPC 8.4[c] by making false writings, false application for driver's license, false statement to driver's licensing agency when he attempted to avoid license suspension, and attempting to reinstate his license). And as already explained, KDOL itself bears part of the blame for the misrepresentation in the first instance by failing to either require applicants to provide their 2019 tax returns or to state that such returns had not yet been filed.

2. *Injury*

While Stewart received a benefit which cost the state funds, those losses to the state were temporary and at least partially caused by the state's negligence. Since approximately October of 2021, Stewart has made efforts to find a way to pay back the money he received, even in the face of difficulty. In these discussions, legal counsel for KDOL informed Stewart's counsel that KDOL "did not have a procedure for accepting payments." However, by the time of Stewart's argument before this court, he had paid back the entire amount. See generally *In re Pistotnik*, 316 Kan. 96, 108, 512 P.3d 729 (2022) ("[R]espondent made a timely, good-faith effort to make restitution and remedy the consequences of his misconduct.").

While Stewart's actions were not victimless, the actual injury to the state was minimal given that Stewart was actually entitled to benefits. Compare with *In re Dennis*, 286 Kan. 708, 737, 188 P.3d 1 (2008) (violation of KRPC 8.4[d] based on "the respondent's repeated failure to comply with court orders and discovery deadlines [which] seriously prejudiced the court, the other parties to the litigation, and opposing counsel"); *In re Mitchell,* 280 Kan. 656, 123 P.3d 1279 (2005) (attorney informed client that she attended a hearing in his child support action and that the court took the matter under advisement; she had not attended hearing; default judgment was entered against client).

89

### 3.  *Seriousness of the matter*

This was a serious matter. Stewart received a significant amount of unemployment compensation from government agencies. This was certainly more than an annoyance. See *In re Pyle*, 283 Kan. at 825-26 ("[R]espondent's conduct ranks as mere whining—petty, annoying, and childish, but far from the dramatic abandonment of honest practice that typifies our Rule 8.4[c] cases."). The seriousness of the misrepresentation itself, however, is significantly mitigated by the unique facts present here. Stewart received benefits based on a genuine misunderstanding of his eligibility for the pandemic assistance program which was induced in part by inadequate guidance by the state. The program was in some sense a square peg in a round hole because it provided unemployment benefits to self-employed individuals, who are typically not eligible for unemployment assistance. And unemployment benefits are determined by reference to "wages," which is a definition not synonymous with terms in the federal tax code, like "taxable income." Compare 26 U.S.C. § 63(a) (taxable income is gross income minus eligible deductions), with K.S.A. 2024 Supp. 44-703(o) (wages are "all compensation for services, including commissions, bonuses, back pay and the cash value of all remuneration, including benefits, paid in any medium other than cash"). Furthermore, the forms Stewart was required to fill out were not well suited for the way he received income. Attorneys who work on contingency fee arrangements may put in long hours of "work" only to receive compensation at a date far into the future, if ever. KDOL even explained, and the panel accepted, that many applicants struggled to understand what the benefit applications were asking for and how undefined terms such as "income," "gross income," "net income," "work," and "wages" should be interpreted.

With this in mind, Stewart's case is not analogous to previous conduct we have considered to be serious. See *In re Borich*, 316 Kan. 257, 267, 274, 514 P.3d 352 (2022) (violating KRPC 8.4[c] by paying clients personal funds and saying it was an arbitration

90

award); *In re Devkota*, 280 Kan. 650, 123 P.3d 1289 (2005) (attorney engaged in dishonest conduct by signing his clients' names to answers to interrogatories and prevailing upon his nonlawyer employee to verify, by notarization, that the false signatures were genuine); *In re Trester*, 285 Kan. 404, 412, 172 P.3d 31 (2007) ("We have no qualms, however, saying that holding oneself out as an attorney in a state in which he or she has no license to practice law and giving the impression the attorney is authorized to practice law generally in that state engages in conduct that violates KRPC 8.4[c]."); *In re Landrith*, 280 Kan. 619, 124 P.3d 467 (2005) (numerous violations through false accusations against others); *In re Nathanson*, 279 Kan. 921, 112 P.3d 162 (2005) (attorney prepared, fraudulently signed, and filed pleadings and correspondence using name of another attorney); *In re Wenger*, 279 Kan. 895, 112 P.3d 199 (2005) (attorney engaged in dishonest conduct by advising his clients that he had filed cases and set hearings and doctor's appointments when he in fact had not); *In re Ware*, 279 Kan. 884, 112 P.3d 155 (2005) (attorney, as in-house counsel, falsified employer's internal documents to make it appear as though she had taken action on a discrimination case filed against it when she had not); *In re Singleton*, 279 Kan. 515, 111 P.3d 630 (2005) (attorney misrepresented documents to judge); *In re Rock*, 279 Kan. 257, 105 P.3d 1290 (2005) (attorney converted client funds, abandoned clients, and committed other misconduct).

4.   *Relationship of the parties*

In considering the relationship of parties, we note that Stewart's misrepresentations did not affect his legal work or his clients. Instead, the parties involved were engaged in an arms-length transaction, with neither party being at any particular disadvantage or in reliance on the other. While government programs that rely on applicants to self-report and self-certify eligibility do impose an obligation of truthfulness, applicants to such programs also rely on government instructions with respect to the information and documentation required. Here, both parties to the transaction failed—a hallmark of

misunderstanding rather than genuine misrepresentation. Compare *In re Boaten*, 281 Kan. 390, 132 P.3d 870 (2006) (attorney converted to his own use settlement proceeds belonging to his clients and repeatedly testified falsely before the hearing panel); *In re Janoski*, 316 Kan. 370, 370-71, 516 P.3d 125 (2022) (finding violations of KRPC 8.4[c] for lying to ex-spouse about hitting her phone from her hand intentionally while she recorded respondent stalking her); *In re Ware*, 279 Kan. at 889 (attorney, as in-house counsel, falsified employer's internal documents).

### 5. *Post-misrepresentation conduct and selfish motive*

The hearing panel found that Stewart applied for assistance during the pandemic after his only client's operations had closed due to the pandemic. He further continued to apply for PUA benefits to use as a "financial safety net" due to his concerns that his law firm would not weather the pandemic. The record indicates that Stewart had a good-faith belief that he was entitled to benefits, and in the week he received what he believed was "personal income," he did not file for benefits. After he initially stopped receiving benefits, he made efforts to contact the KDOL to find out why. He ultimately sought to rectify any harm and did, in fact, make full repayment to the state—even of amounts he almost certainly would have been entitled to. In short, Stewart's actions are consistent with a misunderstanding of his eligibility, not a devious scam.

Considering all of this, we would find that Stewart's misrepresentation does not rise to the level of adversely affecting his fitness to practice law.

*Face down in the gravy—an observation on the "culture" of attorney discipline in Kansas*

It is a frequently observed fact that the culture of attorney discipline in Kansas incentivizes the defense to employ a "mitigation only" strategy that has been described by this court as a tendency to "fall on your sword" when faced with ethics allegations from

the ODA. See *In re Gamble*, 319 Kan. 680, 702-03, 558 P.3d 290 (2024) (Stegall, J., dissenting) (Counsel's position was that "vague" stipulations were made "'[f]or better or for worse'" so that "the parties could 'go on down the road'" and respondent stated that he agreed to stipulate to a violation because he thought it was practically "'the best thing to do'" for himself, his family, his clients, and his practice). So much so that we are anecdotally aware that the mitigation only strategy has become a regular piece of advice at prominent ethics CLEs across the state. Such an approach to defending ethics cases is incentivized by the perceived threat that the ODA will add "failure to cooperate" charges anytime a respondent does not "fall on his sword" combined with the proliferation in recent years of probationary outcomes in ethics cases (more about that later).

We must also acknowledge clearly and plainly that this culture has been principally incentivized by the disciplinary decisions of this court. In other settings—the criminal or civil law, for example—any court commentary on the culture of litigation carried out by another branch of government would likely be tendentious at best. An overreach at worst. In the context of attorney discipline, however, this court is the final arbiter of a profession that is self-policing. We are the branch of government constitutionally authorized to regulate the behavior of the bar. The ODA is an agency responsive only to us. We take pains here to observe that all the actors in this process ultimately take their cues from this court. We ascribe and can discern no ill-motives on the part of either the disciplinary defense bar or the ODA.

Stewart's counsel's handling of this case illustrates how responding to the strong incentive to take a mitigation only approach will likely leave substantive defenses on the cutting room floor and undermine the adversarial process that we rely on. In a case where there were significant substantive defenses available to the respondent—discussed at length above—none were raised. In fact, a review of this record shows clearly that Stewart was faced with counsel on both sides who advocated for his guilt.

93

Here, Stewart's mitigation strategy started early. In March 2024, Stewart and his counsel, along with the ODA, filed a joint stipulation in which Stewart stipulated to behaving "dishonestly" and to violating KRPC 8.4(c). Consistent with these stipulations, Stewart's counsel's narrative before the panel was to accept the ODA's accusation at face-value. Several statements and questions exemplify this strategy:

- "May it please the Panel, counsel, Mr. Stewart, this is a classic, classic story. We have a good person, a good lawyer, clean record, never had any problems who makes what I call a major mistake, uses bad judgment that led us to where we are today."

- "[H]e applied for and received, and he'll admit to you incorrectly and wrongly, a large sum of money. He's not going to whine today. He's not going to blame anybody else. He's going to point the finger at himself."

- "This is not about evidence, anything, other than the fact that he was wrong, my colleagues are right he was wrong, he violated it, and he must stand up to the plate and accept what is given out."

- "What he did was wrong and he stood up to the plate and admitted he was wrong. It was hard. It was hard when my colleagues was cross-examining him because he answered yes and he got quieter because he had to admit, we use the word transgressions a lot, his sins, his faults, the things he did bad."

- "I understand all of that. What he did was wrong. My colleagues are right about that. Hence why he stipulated to the violation. Hence why he entered into a stipulation that saved the Panel three and four days a hearing."

Of course, the majority of the "stipulations" were rejected by both the hearing panel and by this court. (As an aside, the hearing panel is to be commended for its thorough and independent review of the case, despite the stipulation.) A single lone violation was found by the slimmest of margins here. Saving the panel "three or four" days for a hearing is *not* a mitigating fact. Skipping the trial is the antithesis of justice in a legal culture where the adversarial process has broken down. Our trust and confidence in what amount to plea agreements is at its nadir when the record demonstrates that both sides have prosecuted the complaint without exploring viable defenses.

Moreover, counsel didn't simply make legal concessions, he asked Stewart questions which left almost no room for Stewart to defend himself.

- "Q. You agree that you violated the rules as indicated by my colleague and by the Chair of the Panel, correct?

  "A. I do."

- "Q. Well, this is more than reckless, this is dishonest. You've already agreed to that, right?

  "A. Yeah."

- "Q. But all of that begs the question, doesn't it? You stipulated to the fact that you accepted money that you shouldn't have?

  "A. Right."

Counsel went as far in closing as to commend the KDOL for cutting off Stewart's benefits and the ODA for pursuing discipline.

- "I wonder—if this complaint had never happened, I wonder that if the Department of Labor hadn't cut him off and said, [']We think there's some fraud here,['] where he'd be today. He sure as hell would still be drinking. He sure as heck would still be abusive by drinking to his family, to his kids. He wouldn't be a good father. He wouldn't be a good lawyer."

And while we have identified several legitimately confusing aspects of PUA benefits, counsel's primary mitigation argument before the panel was to highlight Stewart's struggles with alcohol. Though Stewart didn't want to "put the entire case on the back of Coors Light," counsel still characterized Stewart as being "face down in the gravy every day for years." Counsel characterized Stewart as "a guy who has a good practice, a guy making okay money, a guy who had a chance to do real well, [who was] knocked to his knees early on because of alcohol and because he was neither smart enough or healthy enough to realize that that was a problem." While Stewart's relationship with alcohol is a serious matter, it had next to nothing to do with the facts of this case.

At oral argument, counsel's understanding as to why the panel only found one violation of the KRPC was that "[t]he panel listened to the mitigation evidence. . . . [T]hey thought he should be given a second chance." But *mitigation* evidence, by definition, should not drive findings as to whether a *violation* occurred. This culture of undermining the adversarial process in favor of a mitigation only approach that treats every ethics case like a social problem causes bad facts to morph into bad law. And now we are several cases deep into this bad law. "Bad facts make bad law. So goes a common legal maxim. The corollary truth that bad law tends to make more bad law is less well

96

known but perhaps the more frequent (and more damaging) occurrence. [Citation omitted.]" *In re Adoption of T.M.M.H.*, 307 Kan. 902, 921, 416 P.3d 999 (2018) (Stegall, J., concurring in result and dissenting).

Multiple justices have previously expressed our concerns with the state of attorney discipline in Kansas:

"In my judgment, a pattern has emerged in recent years of the Disciplinary Administrator's office wielding the code as a sword rather than a shield. And beyond that, after a thorough review of the record, I have never seen such a blatantly unfair and illogical prosecution in a disciplinary matter. Given this, it is not surprising that the attorney discipline defense bar has embraced a strategy of falling on that sword to achieve a favorable recommendation from the ODA or to avoid facing additional allegations. See *In re Spencer*, 317 Kan. 70, 85-86, 524 P.3d 57 (2023) (rejecting the jointly agreed to sanction of a 90-day suspension because of the Disciplinary Administrator's faulty legal theory of liability); *In re Huffman*, 315 Kan. 641, 682-83, 509 P.3d 1253 (2022) (stating that harsh criticism of a judge demonstrated 'a serious lack of judgment' but did not rise to the level of an ethical violation under either KRPC 3.5[d] or KRPC 8.2[a]); *In re Todd*, 308 Kan. 133, 136, 418 P.3d 1265 (2018) (rejecting the disciplinary panel's conclusion that respondent had violated KRPC 8.1[b] despite respondent filing no exceptions).

"Now, there is no question that bare-knuckle plea bargaining is common and is the prerogative of prosecutors. When respondents admit to facts—even if they do so under undo pressure—they are stuck with those admissions. The existence of this practice does, however, impose a high responsibility on courts to thoroughly evaluate the struck bargain for both factual and legal appropriateness. We are not a rubber stamp. See K.S.A. 22-3210(a)(4) (requiring courts in criminal matters to be 'satisfied that there is a factual basis for the plea' before accepting a guilty plea); *State v. Ebaben*, 294 Kan. 807, 812-13, 816, 281 P.3d 129 (2012) (finding an insufficient factual basis for a guilty plea)." *In re Gamble*, 319 Kan. at 710-11 (Stegall, J., dissenting).

A prosecution is within its right to seek admissions. Courts rely on the defense bar to uphold the adversarial nature of the process. And while pleas based on mitigation only strategies are not inappropriate in certain cases, they should not become the default approach lest prosecutorial discretion go unchecked by rigorous testing.

*On "fat tails" and a direction for reform*

We conclude with an admittedly unorthodox final observation. As we noted above, we acknowledge that comments such as these from a reviewing court stray outside the bounds of this particular case (even when, as here, this particular case illustrates our concerns) and would ordinarily indicate a court that is drifting away from its proper judicial lane. But attorney discipline is unique. Here, this court has not only a responsibility to rule in particular cases, but the added responsibility to oversee and guide the entire process. And so we take this opportunity to explain in some detail a regulatory wrinkle we are convinced is now present in the process. We do so not as a species of the unfortunate and aptly named "bench slap"—but in the hopes that elucidating and identifying this common feature of regulatory bodies may draw attention to its prevalence in helpful ways that will aid all actors in the process going forward.

When we think about the law of averages, we usually visualize it as something akin to what mathematicians would call a "bell curve." McLeod, *Introduction to the Normal Distribution (Bell Curve)*, Simple Psychology (Oct. 11, 2023). So if you imagine the average height of 100 people in a room, you understand instinctively from observation that there are a tiny number of very short people; a small number of kinda-short people; a large number of normal-height people; a small number of kinda-tall people; and a tiny number of very tall people. That is an "equalized" distribution curve. So the "tails" of the curve are "thin" because they consist of very few people and—in terms of averages—the few very short people cancel out the few very tall people and the average falls where the vast majority of people actually are.

98

Now think about how human beings calculate risk. When we make decisions, we are always calculating the possible risk inherent in potential futures. And we tend to think about risk distribution in the same way we think about height distribution in the human population. That is—as a thin-tailed bell curve. So, there are a tiny number of possible futures with almost zero risk; a tiny number of possible futures with existential risk; and a huge number of possible futures with modest and manageable risk. The bell curve approach to risk and decision making is brilliantly illustrated in the children's fable Goldilocks. Goldilocks wants to avoid extremes and finds comfort right in the middle— not too hot, not too cold, but just right.

But what if, in complex systems, risk is not distributed evenly across a nice bell curve? What if our normal understanding of averages has blinded us to another possibility? What if the average height of 100 people in a room is actually a function of 50 very short people and 50 very tall people? That distribution curve looks quite different from a bell—it has "fat-tails" instead of "thin-tails." A growing body of scholarship and study from the world of statisticians and public choice theorists is making the compelling case that when it comes to risk assessment in large systems, the curve is not a normal distribution. It is in fact not a curve at all but a hockey stick—one long thin-tail of relatively low risk met at the end by one spiking fat-tail of very high risk.

A simple illustration demonstrates how decision making in the face of potential risk might work when a person intuitively understands he or she is dealing not with a normal distribution, but with a fat tail. If forced to choose, would a rational actor rather fall 1 time off a 20-foot wall, or fall 10 times off a 2-foot wall? Why should it matter which choice is made? The person is going to fall a total of 20 feet no matter what. Doesn't the risk all just average out? Well, obviously not. This is a simple example of what statisticians call "risk acceleration" in the fat-tail. It is why one prominent theorist makes the bold claim that "[w]e worry too much about diabetes and too little about ebola

. . . . This is an error of reasoning that comes from not understanding thick tails." Taleb, *Statistical Consequences of Fat Tails: Real World Preasymptotics, Epistemology, and Applications* 51 (3d ed. 2025).

Now, consider the role of a regulator whose job it is to protect the public from risks associated with whatever activity he or she is regulating. Of interest to us here is the job of regulating attorney conduct in Kansas in order to reduce or eliminate the risk posed to the public and to our system of justice by unethical lawyers.

How is that risk distributed across the population of Kansas lawyers? Most people will think of it the way Goldilocks does; the way we think about height averages—as a bell curve. If we symbolize risk as walls of varying heights that people could fall off of and get hurt, those who regulate attorney conduct likely assess the risk distribution this way—there are a small number of 2-foot walls (low risk); a small number of 20-foot walls (high risk); and a large number of 10-foot walls between them (medium risk). But what if the risk distribution is actually a fat-tail, not a bell curve? That is, what if the "average risk" does not land in the middle, but is actually a function of a very high number of 2-foot walls (an overly zealous advocate, for example, or an attorney who accidentally deposits a retainer into the firm's operating account) and a very small number of 200-foot cliffs (an attorney with multiple DUIs, for example, or one who lies to a court, or one who steals from a client)? This difference would be very important for a regulator of risk to know and understand. In fact, it would dramatically change how he or she approached the job.

Scholars in the field of ethics—covering everything from corporate compliance to police misconduct—have come to recognize that this very error has distorted compliance law in dangerous ways. As one scholar put it,

"Although ubiquitous, the normal distribution is far from the only statistical model available to predict future events. In many areas, scientific thought 'has moved away from the idea of equilibrium' embodied by the bell curve toward what are called 'fat-tail' distributions. These distributions, which are often found in complex systems, represent an important alternative way of understanding probabilities." Haugh, *The Power Few of Corporate Compliance*, 53 Ga. L. Rev. 129, 158 (2018).

"[T]he thicker the tails of the distribution, *the more the tail wags the dog*, that is, the information resides in the tails and less so in the 'body' (the central part) of the distribution." Taleb, *Statistical Consequences of Fat Tails* 29. Put simply, "fat tails" exist when major outliers skew an average. And fat tails are more common than one might think:

"The most difficult policy issues often involve some chance of catastrophic outcomes, but conventional analysis may underestimate the seriousness of the situation. Economic modeling and policy analysis are often based on the assumption that extreme harms are highly unlikely, in the technical sense that the 'tail' of the probability distributions is 'thin'—in other words, that it approaches rapidly to zero. Thin tails allow extreme risks to be given relatively little weight. A growing body of research, however, focuses on the possibility of fat tails, which are common in systems with feedback between different components." Farber, *Uncertainty*, 99 Geo. L.J. 901, 904 (2011).

As a regulator, understanding whether one is dealing with a fat-tail distribution or a bell curve distribution has a significant impact on policy choices. And confusing the two can lead in bad directions. Public choice theorists often refer to this confusion—mistaking a fat-tail for a bell curve—as "probability neglect." And they predict what will happen when a regulating body suffers from probability neglect. "[R]egulatory agencies . . . may neglect the issue of probability, in a way that can lead to either indifference to real risks or costly expenditures for little or no gain. If agencies are falling victim to probability neglect, they might well be violating relevant law." Sunstein, *Probability Neglect: Emotions, Worst Cases, and Law*, 112 Yale L.J. 61, 63 (2002).

101

Put another way, if regulators believe they are dealing with a normalized bell-curve with an equalized distribution of the kinds of behaviors regulators focus on, they will approach their job in a certain way. They will look for regulatory opportunities in the heart of the distribution curve, and they will treat most if not all such opportunities in a rehabilitative posture. If unethical behavior is more-or-less equally distributed across the curve, a regulator may view his or her job as essentially a traffic-cop—keeping the entire crowd ethical by way of handing out somewhat indiscriminate small fines. If the regulator has mistaken the curve, however, this approach comes with dramatically negative unintended consequences. For if the regulator is in fact dealing with a "fat tail" distribution, the traffic-cop approach is likely to result in over-regulation where it is not needed and under-regulation where it is. That is, "indifference to real risks" combined with "costly expenditures for little or no gain." The worst of both worlds.

This fat-tail problem posits—in a highly simplified summary—that regulators tend to be blind to fat-tail risks. They are accustomed instead to interpreting the data in a way that produces a normal distribution. They suffer from probability neglect. As a consequence, two things happen. First, they will over-regulate in a way that sweeps up benign behaviors into the regulatory net; and second, they will underestimate catastrophic risk by treating all offenders as appropriate subjects of mitigation and rehabilitation.

When it comes to behavioral regulation—of a police force for example—this insight is being used to tailor a regulatory scheme to the actual distribution of risk in the regulatory pool.

"The available evidence is that there are a small number of police officers who are responsible for an outsized share of serious police misconduct. The ability to scrutinize and terminate officers who are in the tail of misconduct could have an outsized

102

impact on serious misconduct without significantly undermining the job security generally enjoyed by police officers." Schanzenbach, *Policing the Police: Personnel Management and Police Misconduct*, 75 Vand. L. Rev. 1523, 1567 (2022).

This is to say, scholars argue that eliminating probability neglect within the hotly contested world of constraining and punishing police misconduct will generate a "best of both worlds" regulatory environment that is sensitive to real risks posed by bad actors while eliminating costly burdens imposed on good actors.

We suggest that the attorney discipline process in Kansas may have fallen into this public policy error and it is possible the ODA suffers from a common regulatory ailment—probability neglect. In rough metaphoric terms, the ODA—incentivized by the decisions of this court—may be worrying too much about diabetes and not enough about ebola. Our own observations suggest that the vast majority of Kansas lawyers are ethical—and even their mistakes are relatively risk-free to the public. Unethical lawyers, on the other hand, form a fat-tail in the distribution curve—they are disproportionately responsible for most ethical violations and their behavior presents the highest risk to both the public and to our system of justice as a whole.

The regulatory practice we observe attending this situation in Kansas is as public choice theorists would predict. Over-regulation of the entire distribution curve combined with over-use of mitigation defenses and rehabilitative strategies that are inadequate to address the risks that exist in the fat-tail. This is the counterintuitive pattern of both over- and under-regulation that has emerged in the past decade of disciplinary cases in Kansas. On the one hand, the disciplinary process exacts a high cost on relatively innocent or inconsequential behavior and generates little to no public benefit or risk reduction—while on the other hand, the same process appears to perpetuate high risks by keeping the worst offenders in the pool via rehabilitative and probationary practices. See e.g., Oral Argument at 13:33, *In re Trummel*, No. 128,882 (Kan. S. Ct. argued Dec. 16, 2025) (J.

Biles, asking the ODA why published censure would protect the public from an attorney who had mismanaged client funds and failed to communicate with a client in a child custody matter); *In re Daniels*, 320 Kan. at 378, 381 (imposing discipline of published censure for diligence and communication violations after ODA recommended suspension with probation); *In re Gamble*, 319 Kan. at 695 (a majority of the court imposed a six-month suspension, stayed contingent on a successful one-year probation; three justices dissented arguing there was no ethical violation and the complaint should have never been prosecuted); *In re Fulcher*, 319 Kan. 105, 119, 552 P.3d 1255 (2024) (staying a two-year suspension in favor of probation); *In re Davis*, 318 Kan. 450, 456-57, 543 P.3d 1143 (imposing two-year probation following a period of six months' suspension contrary to the ODA's recommendation of a two-year probation period), *reinstatement granted* 319 Kan. 662, 557 P.3d 28 (2024); *In re Spencer*, 317 Kan. 70, 80, 524 P.3d 57 (2023) (a majority of the court imposed the lesser sanction of published censure rather than the jointly recommended 90-day suspension to be stayed during one-year probation); *In re Sedgwick*, 317 Kan. 826, 840-42, 539 P.3d 1033 (2023) (ODA sought three-year suspension stayed for three years' probation; however, the court imposed six-month suspension stayed during three-year probation); *In re Morton*, 317 Kan. at 751 (court held that published censure was the appropriate discipline, rather than the ODA's recommendation of disbarment); *In re Huffman*, 315 Kan. at 685, 688 (ODA recommended indefinite suspension; court imposed two-year suspension, stayed after the first 90 days provided that respondent enter into an approved probation plan); *In re Long*, 315 Kan. 842, 855, 511 P.3d 952 (2022) (indefinitely suspending an attorney when ODA had recommended a one-year suspension); *In re Martinez*, 315 Kan. 245, 257, 506 P.3d 909 (2022) (staying a three-year suspension in favor of probation); *In re Shepherd*, 310 Kan. 739, 753-55, 448 P.3d 1049 (2019) (ODA recommended indefinite suspension, stayed for five years of probation; court imposed two-year suspension with eligibility for probation after one year), *reinstatement granted* 312 Kan. 827, 483 P.3d 1046 (2021).

In response, we would both narrow and deepen the application of our disciplinary code. That is, we would narrow it to reduce the over-regulation and wasted cost of chasing the low-risk majority of the thin-tail; and we would deepen it to cut off the fat-tail by reducing our reliance on rehabilitative strategies such as probation.

CONCLUSION

Stewart's case is a cautionary tale. To lawyers in Kansas—low-risk mistakes may still land you in trouble; be scrupulous; recognize the regulatory environment you currently operate in and respond accordingly. To the disciplinary defense bar—we cannot do our job unless you do yours; the adversarial process we depend on depends in turn on you. To the ODA—consider whether probability neglect is a feature of attorney conduct regulation in Kansas; we all want the same thing, an ethical bar we can be proud of.

WALL, J., joins the foregoing concurring in part and dissenting in part opinion.